69 F.3d 920
 66 Empl. Prac. Dec. P 43,726, 64 USLW 2219,
95 Cal. Daily Op. Serv. 7821,
95 Daily Journal D.A.R. 13,447
 Maria-Kelley F. YNIGUEZ; Jaime P. Gutierrez, Plaintiffs-Appellees,
and
Arizonans Against Constitutional Tampering,
Intervenors-Plaintiffs-Appellees,
and
State of Arizona; Rose Mofford; Robert Corbin, et al.,
Defendants-Appellees,
v.
ARIZONANS FOR OFFICIAL ENGLISH; Robert D. Parks,
Intervenors-Defendants-Appellants.
Maria-Kelley F. YNIGUEZ, Plaintiff-Appellant,
v.
STATE OF ARIZONA; Rose Mofford; Robert Corbin, et al.,
Defendants-Appellees,
and
Arizonans For Official English; Robert D. Parks,
Intervenors-Defendants-Appellants.
Maria-Kelley F. YNIGUEZ, Plaintiff-Appellee,
v.
STATE OF ARIZONA; Rose Mofford; Robert Corbin, et al.,
Defendants-Appellants.
 Nos. 92-17087, 93-15061, 93-15719.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 3, 1994.
Decided Dec. 7, 1994.
Amended Jan. 17, 1995.
Order Granting Rehearing En Banc
May 12, 1995.
Argued and Submitted July 20, 1995.
Decided Oct. 5, 1995.
 
 Robert J. Pohlman (Catherine Bergin Yalung, on the brief), Ryley, Carlock & Applewhite, Phoenix, Arizona, for plaintiff-appellee-cross-appellant.
 Stephen G. Montoya (George Vice III, on the brief), Bryan Cave, Phoenix, Arizona, for intervenors-plaintiffs-appellees.
 Grant Woods, Arizona Attorney General (Rebecca White Berch, Arizona Solicitor General, on the brief), Phoenix, Arizona, for defendants-appellees.
 Barnaby W. Zall, Williams & Jensen, Washington, DC (James F. Henderson, Scult, Lazarus, French, et. al., Phoenix, Arizona, on the brief), for intervenors-defendants-appellants.
 Appeals from the United States District Court for the District of Arizona.
 Before: WALLACE, Chief Judge, HUG, PREGERSON, REINHARDT, HALL, WIGGINS, BRUNETTI, KOZINSKI, FERNANDEZ, KLEINFELD, and HAWKINS, Circuit Judges.
 Opinion by Judge REINHARDT; Concurrence by Judge BRUNETTI; Special Concurrence by Judge REINHARDT; Dissent by Judge FERNANDEZ; Concurrence to Dissent by Chief Judge WALLACE; Dissent by Judge KOZINSKI.
 REINHARDT, Circuit Judge:
 
 
 1
 These consolidated appeals require us to consider an important area of constitutional law, rarely reexamined since a series of cases in the 1920s in which the Supreme Court struck down laws restricting the use of non-English languages. See Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Bartels v. Iowa, 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047 (1923); Yu Cong Eng v. Trinidad, 271 U.S. 500, 46 S.Ct. 619, 70 L.Ed. 1059 (1926); Farrington v. Tokushige, 273 U.S. 284, 47 S.Ct. 406, 71 L.Ed. 646 (1927). Here, once again, the state has chosen to use its regulatory powers to try to require the exclusive use of the English language.
 
 
 2
 Specifically at issue in this case is the constitutionality of Article XXVIII of the Arizona Constitution. Article XXVIII provides, inter alia, that English is the official language of the state of Arizona, and that the state and its political subdivisions--including all government officials and employees performing government business--must "act" only in English. Arizonans for Official English and its spokesman Robert D. Parks[1] appeal the district court's declaratory judgment that Article XXVIII is facially overbroad in violation of the First Amendment. Maria-Kelly Yniguez, a former Arizona state employee who brought the present action, appeals the district court's denial of nominal damages.
 
 
 3
 This case raises troubling questions regarding the constitutional status of language rights and, conversely, the state's power to restrict such rights. There are valid concerns on both sides. In our diverse and pluralistic society, the importance of establishing common bonds and a common language between citizens is clear. See Guadalupe Organization, Inc. v. Tempe Elementary School Dist., 587 F.2d 1022, 1027 (9th Cir.1978). Equally important, however, is the American tradition of tolerance, a tradition that recognizes a critical difference between encouraging the use of English and repressing the use of other languages. Arizona's rejection of that tradition has severe consequences not only for its public officials and employees, but for the many thousands of Arizonans who would be precluded from receiving essential information from their state and local governments if the drastic prohibition contained in the provision were to be implemented. In deciding this case, therefore, we are guided by what the Supreme Court wrote in Meyer:
 
 
 4
 The protection of the Constitution extends to all, to those who speak other languages as well as those born with English on the tongue. Perhaps it would be highly advantageous if all had ready understanding of our ordinary speech, but this cannot be coerced by methods which conflict with the Constitution--a desirable end cannot be promoted by prohibited means.
 
 
 5
 262 U.S. at 401, 43 S.Ct. at 627.
 
 
 6
 We conclude that Article XXVIII constitutes a prohibited means of promoting the English language and affirm the district court's ruling that it violates the First Amendment.[2]
 
 
 7
 A three-judge panel of this court issued an opinion reaching this same conclusion last year. Yniguez v. Arizonans for Official English, 42 F.3d 1217 (9th Cir.1994). We then decided to reconsider the question en banc. 53 F.3d 1084 (9th Cir.1995). Having done so, we conclude that our opinion was correct. Because the opinion was withdrawn when we went en banc, we re-publish it now, with only a few changes that discuss the applicability of intervening Supreme Court cases or expand on points that warrant further explanation. In almost all respects, however, our en banc opinion is identical to the opinion issued by the three-judge panel.[3]
 
 I.
 Factual Background
 
 8
 In October 1987, Arizonans for Official English initiated a petition drive to amend Arizona's constitution to prohibit the government's use of languages other than English. The drive culminated in the 1988 passage by ballot initiative of Article XXVIII of the Arizona Constitution, entitled "English as the Official Language." The measure passed by a margin of one percentage point, drawing the affirmative votes of 50.5% of Arizonans casting ballots in the election. Under Article XXVIII, English is "the official language of the State of Arizona": "the language of ... all government functions and actions." Secs. 1(1) & 1(2) (see appendix). The provision declares that the "State and all [of its] political subdivisions"--defined as including "all government officials and employees during the performance of government business"--"shall act in English and no other language." Secs. 1(3)(a)(iv) & 3(1)(a).
 
 
 9
 At the time of the passage of the article, Yniguez, a Latina, was employed by the Arizona Department of Administration, where she handled medical malpractice claims asserted against the state. She was bilingual--fluent and literate in both Spanish and English.[4] Prior to the article's passage, Yniguez communicated in Spanish with monolingual Spanish-speaking claimants, and in a combination of English and Spanish with bilingual claimants.
 
 
 10
 State employees who fail to obey the Arizona Constitution are subject to employment sanctions. For this reason, immediately upon passage of Article XXVIII, Yniguez ceased speaking Spanish on the job. She feared that because of Article XXVIII her use of Spanish made her vulnerable to discipline.
 
 
 11
 In November 1988, Yniguez filed an action against the State of Arizona, Governor Rose Mofford, Arizona Attorney General Robert Corbin, and Director of the Arizona Department of Administration Catherine Eden, in federal district court.[5] She sought an injunction against state enforcement of Article XXVIII and a declaration that the provision violated the First and Fourteenth Amendments of the Constitution, as well as federal civil rights laws.
 
 
 12
 Yniguez's complaint was subsequently amended to include Jaime Gutierrez, a Hispanic state senator from Arizona, as a plaintiff. Gutierrez stated that, prior to the passage of Article XXVIII, he spoke Spanish when communicating with his Spanish-speaking constituents and that he continued to do so even after the article's passage. He claimed, however, that he feared that in doing so he was liable to be sued pursuant to Article XXVIII's enforcement provision.
 
 
 13
 The state defendants all moved for dismissal, asserting various jurisdictional bars to the action. While these motions were pending, the plaintiffs conducted discovery and compiled the defendants' admissions to interrogatories into a Statement of Stipulated Facts, filed with the district court in February 1989. Also filed with the court was the Arizona Attorney General's opinion regarding the interpretation of Article XXVIII, which explained that, "to avoid possible conflicts with the federal ... constitution[ ]," the Attorney General had concluded that the Article only covered the "official acts" of the Arizona government. Finally, the court heard testimony from Yniguez, Senator Gutierrez, and Jane Hill, a linguistic anthropologist, about the adverse impact of Article XXVIII on their speech rights, and the speech rights of the Hispanic population of Arizona.
 
 
 14
 The district court issued its judgment and opinion on February 6, 1990. Yniguez v. Mofford, 730 F.Supp. 309 (D.Ariz.1990). First, the district court resolved the defendants' jurisdictional objections. The court reiterated a previous ruling that the Eleventh Amendment protects the State of Arizona from suit, and then ruled that Gutierrez's claims were barred as to all of the defendants. Id. at 311. It reasoned that because state executive branch officials lack authority to prosecute members of the legislative branch, none of the defendants had enforcement power against Gutierrez sufficient to satisfy the doctrine of Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). In addition, the court held that Ex parte Young barred Yniguez's claim against the Attorney General because he had no specific authority to enforce Article XXVIII. Although the court found that Director Eden had authority to enforce Article XXVIII against Yniguez, it nonetheless held that, because Eden had not threatened to do so, she too should be dismissed as a defendant. The court did find, however, that Governor Mofford both had the authority to enforce Article XXVIII against Yniguez, and had sufficiently threatened to do so for Yniguez to maintain an action against her in accordance with Ex parte Young.[6]
 
 
 15
 The district court then reached the merits of Yniguez's claim. 730 F.Supp. at 313. It read Article XXVIII as barring state officers and employees from using any language other than English in performing their official duties, except to the extent that certain limited exceptions described in the provision applied. Finding that Article XXVIII, thus construed, infringed on constitutionally protected speech, the district court ruled that the provision was facially overbroad in violation of the First Amendment.[7] While granting declaratory relief, the court denied injunctive relief because no enforcement action was pending. Notwithstanding the district court's holding that a provision of the Arizona Constitution was unconstitutional under the United States Constitution, Governor Mofford--an outspoken critic of Article XXVIII--decided not to appeal the judgment. Senator Gutierrez, being satisfied with the constitutional determination, did not appeal the ruling that his claim was barred by Ex Parte Young.
 
 
 16
 In response to the state's decision not to appeal, Arizonans for Official English moved to intervene post-judgment pursuant to Fed.R.Civ.P. 24(a), for the purpose of pursuing an appeal of the district court's order. Immediately thereafter, the Arizona Attorney General sought to intervene pursuant to 28 U.S.C. Sec. 2403(b) for the same purpose. The Attorney General also asked that the district court amend the judgment because it did not contain a ruling on the defendants' prior motion to certify to state court the question of Article XXVIII's proper interpretation. The district court denied all three motions. See Yniguez v. Mofford, 130 F.R.D. 410 (D.Ariz.1990) (holding, inter alia, that denial of certification was implicit in previous judgment, and that certification was inappropriate because Article XXVIII is not susceptible of a narrowing construction).
 
 
 17
 On July 19, 1991, we reversed the district court's denial of the intervention motion of Arizonans for Official English. Yniguez v. Arizona, 939 F.2d 727, 740 (9th Cir.1991) ("Yniguez I "). We ruled that because the organization was the principal sponsor of the ballot initiative codified as Article XXVIII, its relationship to the provision was analogous to the relationship of a state legislature to a state statute. Specifically, we found that, as the initiative's sponsor, the group had "a strong interest in the vitality of a provision of the state constitution which [it had] proposed and for which [it had] vigorously campaigned." Id. at 733. Consequently, we held that Arizonans for Official English satisfied both the requirements of Rule 24(a) and the standing requirements of Article III, and could thus intervene for purposes of appeal. Id. at 740. In the same opinion, we affirmed the district court's denial of the Attorney General's motion to intervene insofar as he sought to be reinstated as a party to the appeal, but permitted his intervention pursuant to 28 U.S.C. Sec. 2403(b) for the limited purpose of arguing the constitutionality of Article XXVIII. Id.
 
 
 18
 After we issued our opinion regarding intervention, the state filed a suggestion of mootness based on Yniguez's resignation from the Arizona Department of Administration in April 1990. In our second opinion in this case, Yniguez v. Arizona, 975 F.2d 646, 647 (9th Cir.1992) ("Yniguez II "), we rejected the state's mootness suggestion, reasoning that Yniguez had the right to appeal the district court's failure to award her nominal damages. Id. On December 15, 1992, after Arizonans for Official English filed its notice of appeal in the district court, Yniguez filed her notice of cross-appeal requesting nominal damages.[8]
 
 
 19
 The district court subsequently granted Yniguez's motion for an award of attorney's fees, and the state defendants conditionally appealed that ruling. Their appeal was consolidated with the original appeal on the merits filed by Arizonans for Official English and Yniguez's cross-appeal for nominal damages. All three appeals are now before us, although we do not reach the one relating to attorney's fees. See note 2, supra. To round out the procedural framework, we note that in 1994 we granted the motion of Arizonans Against Constitutional Tampering and its chairman Thomas Espinosa[9] to intervene as plaintiffs-appellees in the case. Arizonans Against Constitutional Tampering was the principal opponent of the ballot initiative that became Article XXVIII, had campaigned against it, and, like Arizonans for Official English, had submitted an argument regarding the initiative's merits which appeared in the official Arizona Publicity Pamphlet. Cf. Yniguez I, 939 F.2d at 733 (noting that sponsors of a ballot initiative have a strong interest in defending provision they campaigned for, so that there is a "virtual per se rule" that they may intervene in litigation involving it). However, in reaching our decision, which provides all the relief that Arizonans Against Constitutional Tampering seeks, we need not rely on that group's standing as a party. Yniguez's standing and that of the other parties and intervenors is sufficient to support the determination that we make here.
 
 II.
 The Proper Construction of Article XXVIII
 A.
 The District Court's Construction
 
 20
 Although eighteen states have adopted "official-English" laws,[10] Arizona's Article XXVIII is "by far the most restrictively worded official-English law to date." Note, English Only Laws and Direct Legislation: The Battle in the States Over Language Minority Rights, 7 J.L. & Pol. 325, 337 (1991).[11] Besides declaring English "the official language of the State of Arizona," Article XXVIII states that English is "the language of ... all government functions and actions." Secs. 1(1), 1(2). The article further specifies that the state and its subdivisions--defined as encompassing "all government officials and employees during the performance of government business"--"shall act in English and no other language." Secs. 1(3)(a)(iv), 3(1)(a). Its broad coverage is punctuated by several exceptions permitting, for example, the use of non-English languages as required by federal law, Sec. 3(2)(a), and in order to protect the rights of criminal defendants and victims of crime, Sec. 3(2)(e).
 
 
 21
 The district court, interpreting what it found to be the "sweeping language" of Article XXVIII, determined that the provision prohibits:
 
 
 22
 the use of any language other than English by all officers and employees of all political subdivisions in Arizona while performing their official duties, save to the extent that they may be allowed to use a foreign language by the limited exceptions contained in Sec. 3(2) of Article XXVIII.
 
 
 23
 Yniguez, 730 F.Supp. at 314.
 
 
 24
 For reasons we explain below, we agree with the district court's construction of the article.
 
 B.
 The Attorney General's Construction
 
 25
 The Arizona Attorney General proffers a highly limited reading of Article XXVIII under which it applies only to "official acts" of state governmental entities.[12] According to this construction of the provision, which the Attorney General has memorialized in a written opinion, the provision "does not mean that languages other than English cannot be used when reasonable to facilitate the day-to-day operation of government." Op.Atty.Gen.Az. No. I89-009 (1989).
 
 
 26
 The Supreme Court has, in the past, looked to the narrowing construction given a provision by the State's Attorney General as a guide to evaluating the provision's scope. Broadrick v. Oklahoma, 413 U.S. 601, 618, 93 S.Ct. 2908, 2919, 37 L.Ed.2d 830 (1973). For two reasons, however, we do not adopt the Attorney General's construction of Article XXVIII in this case. First, the Attorney General's opinion is not binding on the Arizona courts, Marston's Inc. v. Roman Catholic Church of Phoenix, 132 Ariz. 90, 94, 644 P.2d 244, 248 (1982), and is therefore not binding on this court. Compare Virginia v. American Booksellers Ass'n, 484 U.S. 383, 395, 108 S.Ct. 636, 644, 98 L.Ed.2d 782 (1988) (refusing to accept as authoritative a non-binding attorney general opinion), with Frisby v. Schultz, 487 U.S. 474, 483, 108 S.Ct. 2495, 2501, 101 L.Ed.2d 420 (1988) (accepting city's binding narrow interpretation). Second, we cannot adopt the Attorney General's limiting construction because it is completely at odds with Article XXVIII's plain language. The Supreme Court has made clear that a limiting construction will not be accepted unless the provision to be construed is "readily susceptible" to it. American Booksellers Ass'n, 484 U.S. at 397, 108 S.Ct. at 645. Here, Article XXVIII's clear terms are simply not "readily susceptible" to the constraints that the Attorney General attempts to place on them.
 
 
 27
 The Attorney General's reading of Article XXVIII focuses on Sec. 3(1)(a), which provides, with limited exceptions, that the "State and all political subdivisions of this State shall act in English and in no other language." Sec. 3(1)(a). The Attorney General takes the word "act" from Sec. 3(1)(a) and engrafts onto it the word "official," found in the Article's proclamation of English as the official language of Arizona. In thus urging that the Article only applies to the "official acts" of the state, he also relies on a limited meaning of the noun "act," defined as a "decision or determination of a sovereign, a legislative council, or a court of justice." Op.Atty.Gen.Az. No. I89-009, at 21 (quoting Webster's International Dictionary 20 (3d ed., unabridged, 1976) (third sense of "act")). In doing so, however, he ignores the fact that "act," when used as a verb as in Article XXVIII, does not include among its meanings this limited one.[13] Moreover, even were such a meaning somehow plausible if the two phrases were examined out of context, it is contradicted by the remainder of the provision.
 
 
 28
 Section 1(3)(a)(iv) broadly declares that the rule that Arizona "act in English and in no other language" applies to all government officials and employees during the performance of government business. This prohibition on the use of foreign languages when conducting government business supplements the Article's listing of "statutes, ordinances, rules, orders, programs and policies," an enumeration of presumably official acts on which the Attorney General relies heavily. Sec. 1(3)(a)(iii). Thus, not only is the Attorney General's narrow reading of Article XXVIII contradicted by the provision's expansive language, his reading would render a sizeable portion of the Article superfluous, "violating the settled rule that a [provision] must, if possible, be construed in such fashion that every word has some operative effect." United States v. Nordic Village, Inc., 503 U.S. 30, 36, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992) (emphasis added); Mackey v. Lanier Collection Agency & Serv., 486 U.S. 825, 837 & n. 11, 108 S.Ct. 2182, 2189 & n. 11, 100 L.Ed.2d 836 (1988). Here, of course, it is not simply certain words that would, under the Attorney General's reading, become redundant; instead, entire subsections of the provisions would be rendered unnecessary and repetitive.
 
 
 29
 Indeed, the district court's broader construction of Article XXVIII is the only way to give effect to any of the exceptions contained in Sec. 3(2). If, for example, public teachers in the regular course of their teaching duties would not otherwise be covered by the provision, then there would be no reason to include specific exceptions for some of their duties. See Sec. 3(2)(a) & (c). Moreover, the provision's clear and specific exclusion of some of the functions of public teachers indicates that the measure on its face applies to other "government employees" performing other types of governmental duties that are not specifically excluded--employees such as clerks at the Department of Motor Vehicles or receptionists at state welfare offices, and other state employees who deliver services to the public. Public teachers' duties do not constitute "official acts" of the state any more or any less than do the duties of these other categories of employees.
 
 
 30
 Certainly, there is no justification in the text of Article XXVIII for the Attorney General's ingenious suggestion that languages other than English may be used whenever such use would reasonably "facilitate the day-to-day operation of government"--that, in other words, the provision's plain and unequivocal prohibition on the use of other languages may be ignored if it is expedient to do so. To read such a broad and general exception into Article XXVIII would run directly contrary to its structure, scope, and purpose, and would effectively nullify the bulk of its coverage. Article XXVIII plainly does not set forth an innocuous, pragmatic rule that tolerates the use of languages other than English whenever beneficial to the public welfare. Its mandate is precisely the opposite. The use of languages other than English is banned except when expressly permitted. Indeed, the narrow exceptions that set forth the limited circumstances under which non-English languages may be spoken directly belie the conveniently flexible approach that the Attorney General has adopted for purposes of attempting to resurrect a facially unconstitutional measure.
 
 C.
 Abstention and Certification
 
 31
 The Attorney General argues, alternatively, that because the Arizona state courts have not had an opportunity to interpret Article XXVIII, we should abstain from deciding this case and certify the question of the proper interpretation of Article XXVIII to the Arizona Supreme Court. See Ariz.Rev.Stat.Ann. Sec. 12-1861 (permitting federal courts to certify questions of state law to Arizona Supreme Court).
 
 
 32
 First, we note that a federal court should abstain only in exceptional circumstances, Lind, 30 F.3d at 1121 (citing Houston v. Hill, 482 U.S. 451, 467, 107 S.Ct. 2502, 2512, 96 L.Ed.2d 398 (1987)), and should be especially reluctant to abstain in First Amendment cases, Ripplinger v. Collins, 868 F.2d 1043, 1056 (9th Cir.1989). Abstention pending a narrowing construction of a provision by the state courts is inappropriate where the provision is "justifiably attacked on [its] face as abridging free expression." Id. at 1048 (citations and quotations omitted). In fact, the Supreme Court has made it clear that whenever federal constitutional rights are at stake "the relevant inquiry is not whether there is a bare, though unlikely possibility that the state courts might render adjudication of the federal question unnecessary." Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 237, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984) (emphasis in original). "Rather," the Court continued, " 'we have frequently emphasized that abstention is not to be ordered unless the statute is of an uncertain nature, and is obviously susceptible of a limiting construction.' " Id. (quoting Zwickler v. Koota, 389 U.S. 241, 251 & n. 14, 88 S.Ct. 391, 397 & n. 14, 19 L.Ed.2d 444.). It follows that a court may not abstain and certify a question of statutory interpretation if the statute at issue requires "a complete rewrite" in order to pass constitutional scrutiny. Lind, 30 F.3d at 1121 (citing Houston, 482 U.S. at 470-71, 107 S.Ct. at 2514-15).
 
 
 33
 To be sure, the Supreme Court in American Booksellers did opt to certify the question of the proper interpretation of a statute to the Virginia Supreme Court. 484 U.S. at 386, 108 S.Ct. at 639. However, American Booksellers presented the Court with a "unique factual and procedural setting." Id. In that case, the plaintiffs had filed a pre-enforcement challenge to a state obscenity statute that the State Attorney General conceded would be unconstitutional if construed as the plaintiffs contended it should be. Id. at 393 & n. 8, 108 S.Ct. at 643 & n. 8 (quoting state counsel as saying that if the plaintiffs' interpretation of the statute were correct, then the state "should lose the case"). Moreover, there were no non-governmental defendants such as Arizonans for Official English in the case, no state court had ever had the opportunity to interpret the pertinent statutory language, and both levels of lower federal courts had made critically flawed assessments of the statute's coverage because they had relied on invalid evidence. Id. at 395-97, 108 S.Ct. at 644-45.
 
 
 34
 The Attorney General here, in contrast, has never conceded that the statute would be unconstitutional if construed as Yniguez asserts it properly should be.[14] Moreover, at least one Arizona state court has had the opportunity to construe Article XXVIII, and has done nothing to narrow it. See Ruiz v. State, No. CV 92-19603 (Jan. 24, 1994) (disposing of First Amendment challenge in three paragraphs). Thus, unlike in Virginia Booksellers, there are no unique circumstances in this case militating in favor of certification. See Lind, 30 F.3d at 1122 n. 7 (declining to certify question of state law interpretation in the absence of state concession that law would be unconstitutional on the plaintiff's construction). Accordingly, we must proceed to determine the constitutionality of Article XXVIII.
 
 D.
 Conclusion
 
 35
 We agree with the district court's construction of Article XXVIII. The article's plain language broadly prohibits all government officials and employees from speaking languages other than English in performing their official duties, save to the extent that the use of non-English languages is permitted pursuant to the provision's narrow exceptions section. We reject both the Attorney General's narrowing construction of the article and his suggestion of abstention and certification. We conclude that were an Arizona court ever to give the broad language of Article XXVIII a limiting construction similar to that proffered by the Attorney General, it would constitute a "remarkable job of plastic surgery upon the face of the [provision]." Shuttlesworth v. City of Birmingham, 394 U.S. 147, 153, 89 S.Ct. 935, 940, 22 L.Ed.2d 162 (1969). Where, as here, a state provision has been challenged on federal constitutional grounds and a state's limiting construction of that provision would directly clash with its plain meaning, we should neither abstain nor certify the question to the state courts. Rather, under such circumstances, it is our duty to adjudicate the constitutional question without delay.
 
 III.
 Article XXVIII and The First Amendment
 A.
 Overbreadth
 
 36
 After construing Article XXVIII, the district court ruled that it was unconstitutionally overbroad. Under the overbreadth doctrine, an individual whose own speech may constitutionally be prohibited under a given provision is permitted to challenge its facial validity because of the threat that the speech of third parties not before the court will be chilled. Board of Airport Comm'rs v. Jews for Jesus, 482 U.S. 569, 574, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987). Moreover, a party may challenge a law as facially overbroad that would be unconstitutional as applied to him so long as it would also chill the speech of absent third parties. Lind, 30 F.3d at 1122-23 (finding statute unconstitutionally overbroad as well as unconstitutional as applied to plaintiff). The facial invalidation that overbreadth permits is necessary to protect the First Amendment rights of speakers who may fear to challenge the provision on their own. See Brockett v. Spokane Arcades, 472 U.S. 491, 503, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985). However, in order to support a facial overbreadth challenge, there must always be a "realistic danger" that the provision will significantly compromise the speech rights involved. Board of Airport Comm'rs, 482 U.S. at 574, 107 S.Ct. at 2572.
 
 
 37
 A provision will not be facially invalidated on overbreadth grounds unless its overbreadth is both real and substantial judged in relation to its plainly legitimate sweep, and the provision is not susceptible to a narrowing construction that would cure its constitutional infirmity. See Broadrick v. Oklahoma, 413 U.S. 601, 613, 615, 93 S.Ct. 2908, 2916, 2917, 37 L.Ed.2d 830 (1973); United States v. Austin, 902 F.2d 743, 744 (9th Cir.1990), cert. denied, 498 U.S. 874, 111 S.Ct. 200, 112 L.Ed.2d 161 (1990). Accordingly, a law will not be facially invalidated simply because it has some conceivably unconstitutional applications. Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 800, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984). Rather, to support a finding of overbreadth, there must be a substantial number of instances in which the provision will violate the First Amendment. New York State Club Ass'n v. City of New York, 487 U.S. 1, 13, 108 S.Ct. 2225, 2234, 101 L.Ed.2d 1 (1988).
 
 
 38
 Yniguez contends that Article XXVIII unlawfully prevented her from speaking Spanish with the Spanish-speaking claimants that came to her Department of Administration office. Yniguez, however, challenges far more than Article XXVIII's ban on her own use of Spanish in the performance of her own particular job. She also contends that the speech rights of innumerable employees, officials, and officers in all departments and at all levels of Arizona's state and local governments are chilled by Article XXVIII's expansive reach. At least as important, she contends that the interests of many thousands of non-English-speaking Arizonans in receiving vital information would be drastically and unlawfully limited. For those reasons, she challenges Article XXVIII as overbroad on its face and invalid in its entirety.
 
 
 39
 Article XXVIII's ban on the use of languages other than English by persons in government service could hardly be more inclusive. The provision plainly states that it applies to "the legislative, executive, and judicial branches" of both state and local government, and to "all government officials and employees during the performance of government business." Secs. 1(3)(a)(i), (ii) & (iv). This broad language means that Article XXVIII on its face applies to speech in a seemingly limitless variety of governmental settings, from ministerial statements by civil servants at the office to teachers speaking in the classroom, from town-hall discussions between constituents and their representatives to the translation of judicial proceedings in the courtroom.[15] Under the article, the Arizona state universities would be barred from issuing diplomas in Latin, and judges performing weddings would be prohibited from saying "Mazel Tov" as part of the official marriage ceremony. Accordingly, it is self-evident that Article XXVIII's sweeping English-only mandate limits the speech of governmental actors serving in a wide range of work-related contexts that differ significantly from that in which Yniguez performed her daily tasks. The speech rights of all of Arizona's state and local employees, officials, and officers are thus adversely affected in a potentially unconstitutional manner by the breadth of Article XXVIII's ban on non-English governmental speech. Similarly, the interests of non-English-speaking Arizonans in receiving all kinds of essential information are severely burdened. For these reasons, we cannot say that the provision's "only unconstitutional application is the one directed at a party before the court...." Lind, 30 F.3d at 1122. Therefore, Yniguez's challenge to Article XXVIII properly implicates overbreadth analysis and, if unconstitutional, "the entire [provision] may be invalidated to protect First Amendment interests." Id.
 
 
 40
 Facial invalidation is also appropriate here because the broad language employed throughout Article XXVIII relates to a single subject and is based on a single premise, which, as we will discuss subsequently, is constitutionally flawed. In cases such as this, where the provision in question "in all its applications ... operates on a fundamentally mistaken premise," Secretary of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 966, 104 S.Ct. 2839, 2852, 81 L.Ed.2d 786 (1984), the Supreme Court "has not limited itself to refining the law by preventing improper applications on a case-by-case basis." Id. at 965 n. 13, 104 S.Ct. at 2852 n. 13. Rather, the Court will simply strike down the provision on its face. "[W]here the defect in the [provision] is that the means chosen to accomplish the state's objectives are too imprecise, so that in all its applications the [provision] creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack." Id. at 967-68, 104 S.Ct. at 2852-53.
 
 
 41
 Moreover, the nature and structure of Article XXVIII is such that if we determine it to be unconstitutionally overbroad, then we must invalidate the entire article and not simply some of its sections. Even a cursory reading of Article XXVIII demonstrates that the provision is an integrated whole that seeks to achieve a specific result: to prohibit the use in all oral and written communications by persons connected with the government of all words and phrases in any language other than English. There is no fair reading of the article that would permit some of its language to be divorced from this overriding objective.
 
 
 42
 Equally important, the article contains no severability provision that would suggest that any clause or section was intended to survive if other parts were held unconstitutional, cf. Brockett, 472 U.S. at 506, 105 S.Ct. at 2803 (citing a statute's severability clause as an important factor favoring partial rather than facial invalidation), and the parties before the court have never treated Article XXVIII as anything other than a single entity that must stand or fall as a whole. Indeed, appellees have always presented Article XXVIII as an integrated provision that is designed to eliminate all non-English words from governmental speech, although they have pressed for an artificially narrow construction of what constitutes such speech. Thus, if the article's specific restrictions on the use of languages other than English are unconstitutionally overbroad, then the language and structure of the amendment makes facial invalidation of the entire article the only appropriate remedy.
 
 
 43
 As we noted at the outset of this section, however, Article XXVIII will only be unconstitutionally overbroad if it violates the First Amendment in a substantial number of instances. New York State Club Ass'n, 487 U.S. at 13, 108 S.Ct. at 2234. To determine whether Article XXVIII's restrictions unconstitutionally impose on the speech rights of a substantial number of persons in government service in a substantial number of instances, we need only consider the article's impact on Arizona's numerous state and local public employees. In sheer number, these employees represent the most substantial target of Article XXVIII's restrictions on speech in languages other than English as they constitute the most common source of communications between the government and the public that it serves. In addition, a determination that Article XXVIII unconstitutionally infringes on the First Amendment rights of these employees will necessarily result in the conclusion that the article also unlawfully chills the speech of many others who serve in government, such as judges and legislators. The same restrictions that are unconstitutional as to the routine speech often engaged in by civil servants will a fortiori be unconstitutional as to the various kinds of speech engaged in by a substantial number of other persons who work in government and are therefore affected by the article's unusually broad reach. See Yniguez, 730 F.Supp. at 314; Cf. Bond v. Floyd, 385 U.S. 116, 132-33, 87 S.Ct. 339, 347-48, 17 L.Ed.2d 235 (1966) (a state may not impose stricter First Amendment standards on legislators).[16]
 
 
 44
 Yniguez's challenge to Article XXVIII thus presents us with a clear issue. If we determine that Article XXVIII's impact on the speech rights of public employees is unconstitutional, we will be compelled to invalidate Article XXVIII on its face and in its entirety. Before turning directly to the article's impact on the First Amendment rights of public employees, however, we must first address two preliminary arguments that are raised by the appellants and that could affect our analysis. First, Arizonans for Official English contends that Article XXVIII interferes only with expressive conduct and not pure speech. Second, the group contends that the state may not be compelled to provide information to all members of the public in a language that they can comprehend. For the reasons that we explain below, the two arguments do not affect the ultimate conclusions that we reach.
 
 B.
 Speech v. Expressive Conduct
 
 45
 Arizonans for Official English argues vehemently that First Amendment scrutiny should be relaxed in this case because the decision to speak a non-English language does not implicate pure speech rights. Rather, the group suggests, "choice of language ... is a mode of conduct"--a "nonverbal expressive activity." Opening Brief at 15, 18 (emphasis added) (quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 385, 112 S.Ct. 2538, 2544, 120 L.Ed.2d 305 (1992)). Accordingly, it compares this case to those involving only "expressive conduct" or "symbolic speech." E.g., Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (burning American flag for expressive reasons); Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing arm band for expressive reasons); United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (burning draft card for expressive reasons). In such cases, the government generally has a wider latitude in regulating the conduct involved, but only when the regulation is not directed at the communicative nature of that conduct. Johnson, 491 U.S. at 406, 109 S.Ct. at 2540.
 
 
 46
 We find the analysis employed in the above cases to be inapplicable here, as we are entirely unpersuaded by the comparison between speaking languages other than English and burning flags.[17] Of course, speech in any language consists of the "expressive conduct" of vibrating one's vocal chords, moving one's mouth and thereby making sounds, or of putting pen to paper, or hand to keyboard. Yet the fact that such "conduct" is shaped by a language--that is, a sophisticated and complex system of understood meanings--is what makes it speech.[18] Language is by definition speech, and the regulation of any language is the regulation of speech.
 
 
 47
 A bilingual person does, of course, make an expressive choice by choosing to speak one language rather than another.[19] As Yniguez explained, her choice to speak Spanish with other bilingual people can signify "solidarity" or "comfortableness."[20] Nonetheless, this expressive effect does not reduce choice of language to the level of "conduct," as posited by Arizonans for Official English; instead, it exemplifies the variety of ways that one's use of language conveys meaning. For example, even within a given language, the choice of specific words or tone of voice may critically affect the message conveyed. Such variables--language, words, wording, tone of voice--are not expressive conduct, but are simply among the communicative elements of speech. Moreover, the choice to use a given language may often simply be based on a pragmatic desire to convey information to someone so that they may understand it. That is in fact the basis for the choice involved in the constitutional challenge we consider here.
 
 
 48
 The Supreme Court recognized the First Amendment status of choice of language in somewhat different circumstances when it ratified a speaker's freedom to say "fuck the draft" rather than "I strongly oppose the draft." Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (reversing conviction under California "offensive conduct" law). Like the proponents of Article XXVIII, the state in Cohen had described Cohen's choice of language as conduct equivalent to burning a draft card. Id. at 18, 91 S.Ct. at 1784 (citing O'Brien, supra ); see also id. at 27, 91 S.Ct. at 1789 (Blackmun, J., dissenting) (arguing that Cohen's phrasing "was mainly conduct and little speech"). The Court unequivocally rejected the comparison, stating that Cohen's conviction rested "solely upon speech." Id. at 18, 91 S.Ct. at 1784.
 
 
 49
 Warning that the First Amendment does not, however, give people the absolute right to use any form of address in any circumstances, the Court next addressed the question of whether Cohen's conviction could potentially be upheld as a regulation of the manner of Cohen's speech. Id. at 19, 91 S.Ct. at 1785. Specifically, it framed the First Amendment issue by asking "whether California can excise ... one particularly scurrilous epithet from the public discourse." Id. at 22, 91 S.Ct. at 1787. Its answer to that question was, "No." Indeed, in justifying its conclusion, the Court echoed Yniguez's comments regarding her use of Spanish. It stated that "words are often chosen as much for their emotive as their cognitive force"--to such an extent, in fact, that this emotive aspect "may often be the more important element of the overall message sought to be communicated." Id. at 26, 91 S.Ct. at 1788.
 
 
 50
 Under Article XXVIII, of course, the state is not singling out one word for repression, but rather entire vocabularies. Moreover, the languages of Cervantes, Proust, Tolstoy, and Lao-Tze, among others, can hardly be described as "scurrilous." In this case, therefore, the Court's admonishment that "in a society as diverse and populous as ours" the state has "no right to cleanse public debate" of unpopular words, rings even truer. Id. at 24-25, 91 S.Ct. at 1787-88. While Arizonans for Official English complains of the "Babel" of many languages, the Court in Cohen responds that this "verbal cacophony is ... not a sign of weakness but of strength." Id. at 25, 91 S.Ct. at 1788; see also Alfonso v. Board of Review, 89 N.J. 41, 444 A.2d 1075, 1085 (Wilentz, C.J. dissenting) (arguing that notice should be given in the language of the claimant and stating that to do so would show that "we are strong enough to give meaning to our fundamental rights when they are possessed by non-English speaking people in our midst"), cert. denied, 459 U.S. 806, 103 S.Ct. 30, 74 L.Ed.2d 45 (1982).
 
 
 51
 As we have noted, it is frequently the need to convey information to members of the public that dictates the decision to speak in a different tongue. If all state and local officials and employees are prohibited from doing so, Arizonans who do not speak English will be unable to receive much essential information concerning their daily needs and lives. To call a prohibition that precludes the conveying of information to thousands of Arizonans in a language they can comprehend a mere regulation of "mode of expression" is to miss entirely the basic point of First Amendment protections.[21]
 
 
 52
 In sum, we most emphatically reject the suggestion that the decision to speak in a language other than English does not implicate pure speech concerns, but is instead akin to expressive conduct. Speech in any language is still speech, and the decision to speak in another language is a decision involving speech alone.
 
 C.
 Affirmative Versus Negative Rights
 
 53
 Arizonans for Official English next contends, incorrectly, that Yniguez seeks an affirmative right to have government operations conducted in foreign tongues. Because the organization misconceives Yniguez's argument, it relies on a series of cases in which non-English-speaking plaintiffs have unsuccessfully tried to require the government to provide them with services in their own language. See Guadalupe Org. Inc., 587 F.2d at 1024 (no right to bilingual education); Carmona v. Sheffield, 475 F.2d 738 (9th Cir.1973) (no right to unemployment notices in Spanish); Toure v. United States, 24 F.3d 444 (2d Cir.1994) (no right to notice of administrative seizure in French); Soberal-Perez v. Heckler, 717 F.2d 36 (2d Cir.1983) (no right to Social Security notices and services in Spanish), cert. denied, 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984); Frontera v. Sindell, 522 F.2d 1215 (6th Cir.1975) (no right to civil service exam in Spanish). These cases, however, hold only that (at least under the circumstances there involved) non-English speakers have no affirmative right to compel state government to provide information in a language that they can comprehend. The cases are inapplicable here.
 
 
 54
 In the case before us, there is no claim of an affirmative right to compel the state to provide multilingual information, but instead only a claim of a negative right: that the state cannot, consistent with the First Amendment, gag the employees currently providing members of the public with information and thereby effectively preclude large numbers of persons from receiving information that they have previously received. Cf. Board of Educ., Island Trees Union Free School Dist. No. 26 v. Pico, 457 U.S. 853, 866-67, 102 S.Ct. 2799, 2807-08, 73 L.Ed.2d 435 (1982).[22] Such a claim falls squarely within the confines of traditional free speech doctrine, and is in no way dependent on a finding of an affirmative duty on the part of the state.
 
 
 55
 The clearest example of the distinction between affirmative and negative rights may be seen in the case of a state legislator who may seek office and be elected in part because of his ability to speak with his constituents in their native languages. No one could order such an official to speak Spanish or Navajo. Neither, however, can the state preclude him or his staff from transmitting information regarding official state business to persons resident in his district in whatever language he deems to be in the best interest of those he was elected to serve.
 
 
 56
 The cases relied on by the amendment's sponsors are inapplicable not only because they involve claims of affirmative rights but because they neither consider nor discuss the First Amendment. Rather, in all those cases the plaintiffs sought to justify the alleged right to compel the state to provide bilingual information and services by reference to equal protection and due process principles. Because mandating compliance with the plaintiffs' requests would have placed an affirmative burden on state and local agencies to supply a bilingual speaker--creating affirmative costs--the courts rejected the claims. See, e.g., Frontera, 522 F.2d at 1219 (emphasizing that the cost of bilingual civil service examinations "would ultimately be saddled upon the harried taxpayers of Cleveland"); Toure, 24 F.3d at 446 (requirement of notice in language of plaintiff would "impose a patently unreasonable burden upon the government").
 
 
 57
 Accordingly, the argument of the amendment's sponsor is irrelevant to the right we consider in this case. For while the state may not be under any obligation to provide multilingual services and information, it is an entirely different matter when it deliberately sets out to prohibit the languages customarily employed by public employees. In this connection, we note that here, unlike in the affirmative right cases, there is no contention that "harried taxpayers" will be "saddled" with additional costs, or that the state will be subjected to a "patently unreasonable burden." All that the state must do to comply with the Constitution in this case is to refrain from terminating normal and cost-free services for reasons that are invidious, discriminatory, or, at the very least, wholly insufficient.
 
 D.
 Public Employee Speech
 1.
 General Principles
 
 58
 If this case involved a statewide ban on all uses of languages other than English within the geographical jurisdiction of the state of Arizona, the constitutional outcome would be clear. A state cannot simply prohibit all persons within its borders from speaking in the tongue of their choice. Such a restriction on private speech obviously could not stand. Meyer v. Nebraska, 262 U.S. 390, 401, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923). However, Article XXVIII's restraint on speech is of more limited scope. Its ban is restricted to speech by persons performing services for the government. Thus, we must look beyond first principles of First Amendment doctrine and consider the question of what limitations may constitutionally be placed on the speech of government servants.
 
 
 59
 For nearly half-a-century, it has been axiomatic in constitutional law that government employees do not simply forfeit their First Amendment rights upon entering the public workplace. In 1972, the Supreme Court elaborated on this principle in upholding a constitutional challenge to a state college's refusal to renew the contract of a teacher who had criticized its policies. See Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). "For at least a quarter century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests--especially his interest in freedom of speech.... [M]ost often, we have applied this principle to denials of public employment." Id. Only four years ago, the Supreme Court in Rutan v. Republican Party of Illinois, 497 U.S. 62, 72, 110 S.Ct. 2729, 2736, 111 L.Ed.2d 52 (1990), reaffirmed this principle and reiterated these same words from Perry in upholding a First Amendment challenge to a governmental infringement on public employee rights. Thus, the Supreme Court has made it abundantly clear that prohibitions on speech may not be justified by the simple assertion that the government is the employee's employer.
 
 2.
 
 60
 Regulation of Traditional Types of Public Employee Speech
 
 
 61
 Arizonans for Official English acknowledges that public employee speech is entitled to First Amendment protection. The group then correctly points out that the Supreme Court has held in a series of cases that the government traditionally has a freer hand in regulating the speech of its employees than it does in regulating the speech of private citizens. See Waters v. Churchill, --- U.S. ----, ----, 114 S.Ct. 1878, 1886, 128 L.Ed.2d 686 (1994) (plurality opinion); Rankin v. McPherson, 483 U.S. 378, 384, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987); Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); Pickering v. Board of Educ. of Township High School Dist., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). As the Court in Waters explained, "even many of the most fundamental maxims of our First Amendment jurisprudence cannot reasonably be applied to speech by government employees." --- U.S. at ----, 114 S.Ct. at 1886. Notably, the Waters Court stated that the Cohen rule mandating toleration of choice of language would be inapplicable to the government workplace and made it clear that, in fact, a government employer might appropriately bar its employees from using rude or vulgar language in the workplace. Id.; see also Martin v. Parrish, 805 F.2d 583, 584 (5th Cir.1986).
 
 
 62
 Elaborating on concepts previously expressed in Pickering and Connick, the Waters Court examined the reasons that less stringent scrutiny is ordinarily justified in reviewing restrictions on public employee speech. The Court found, in particular, that "the extra power the government has in this area comes from the nature of the government's mission as employer," id. at ----, 114 S.Ct. at 1887, and it ultimately concluded that:
 
 
 63
 [t]he key to First Amendment analysis of government employment decisions ... is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.
 
 
 64
 Id. at ----, 114 S.Ct. at 1888 (emphases added); see also Pickering, 391 U.S. at 568, 88 S.Ct. at 1734; Connick, 461 U.S. at 146-47, 103 S.Ct. at 1689-90; Rankin, 483 U.S. at 388, 107 S.Ct. at 2899.
 
 
 65
 Thus, the Court has made it clear that it is the government's interest in performing its functions efficiently and effectively that underlies its right to exercise greater control over the speech of public employees. Even before Waters, the Court's concern for efficiency and effectiveness led it to conclude that when a public employee speaks "as an employee upon matters only of personal interest," then, "absent the most unusual circumstances," the challenged speech restriction will be upheld. Connick, 461 U.S. at 147, 103 S.Ct. at 1690; Rankin, 483 U.S. at 385 n. 13, 107 S.Ct. at 2899 n. 13. Concerned that "government offices could not function if every employment decision became a constitutional matter," the Court ruled that mere "employee grievances," (Connick, 461 U.S. at 146, 103 S.Ct. at 1690)--involving speech, for example, about "internal working conditions, affecting only the speaker and co-workers," (O'Connor v. Steeves, 994 F.2d 905, 914 (1st Cir.1993))--should rarely be protected by the federal courts.
 
 
 66
 The Waters /Pickering cases also establish, however, that public employee speech deserves far greater protection when the employee is speaking not simply upon employment matters of personal or internal interest but instead "as a citizen upon matters of public concern". Connick, 461 U.S. at 147, 103 S.Ct. at 1690. In evaluating restrictions on speech of "public concern," the governmental interest in efficiency and effectiveness is important but not necessarily determinative. In such cases, the content of the speech requires that the government's concern with efficiency and effectiveness be balanced against the public employee's first amendment interest in speaking as emphasized in Perry and Rutan. See Waters, --- U.S. at ----, 114 S.Ct. at 1887; Gillette v. Delmore, 886 F.2d 1194, 1197 (9th Cir.1989). As the Court said in Waters, "a government employee, like any citizen, may have a strong, legitimate interest in speaking out on public matters. In many such situations, the government may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished." --- U.S. at ----, 114 S.Ct. at 1887.
 
 3.
 
 67
 The Interests Favoring Protection of the Prohibited Speech
 
 
 68
 Here the speech does not fit easily into any of the categories previously established in the case law. It is clear that the speech at issue cannot be dismissed as merely speech involving "employee grievances" or "internal working conditions"--speech that is ordinarily of little concern to the general public. Nor is it precisely the same as the speech generally denominated in past cases as "speech on matters of public concern," in part because here the employee is not simply commenting on a public issue but in speaking is actually performing his official duties.[23]
 
 
 69
 This case does not, however, require us to attempt to resolve any broad, general questions regarding the scope of government's authority to regulate speech that occurs as part of an employee's official duties. In many instances, the governmental interest in regulation will be at its height in such cases. For example, the government would have an indisputable right to prohibit its employees from using profanity or abusive language while conducting official business. See Waters, --- U.S. at ----, 114 S.Ct. at 1886 (noting that government might prohibit its employees "from being 'rude to customers' ") (citation omitted). Similarly, the government would ordinarily have the authority to determine the tasks that it asks its employees to perform and to dictate the content of the messages that it wishes its employees to communicate to the public. On the other hand, there are few First Amendment precedents in this area, and in at least one case involving a school teacher, we employed a traditional balancing test. See, e.g., Nicholson v. Board of Educ., 682 F.2d 858, 865 (9th Cir.1982) (applying Pickering balancing test to job performance speech). For present purposes, it is enough to note that the fact that the speech occurs as a part of the performance of the employee's job functions affects the nature of our analysis but does not necessarily determine its outcome. The context in which the speech occurs must be weighed along with the other relevant factors when we balance the conflicting interests. Here, the context actually militates in favor of protecting the speech involved.[24]
 
 
 70
 In deciding whether to afford constitutional protection to prohibited employee speech, we must consider both the general interest of the public servant in speaking freely, as described in Perry and Rutan, and the importance to the public of the speech involved. See Connick, 461 U.S. at 149, 103 S.Ct. at 1691 (considering the public's interest in the speech in determining whether to protect it); Pickering, 391 U.S. at 571-72, 88 S.Ct. at 1736 (same). The employee speech banned by Article XXVIII is unquestionably of public import. It pertains to the provision of governmental services and information. Unless that speech is delivered in a form that the intended recipients can comprehend, they are likely to be deprived of much needed data as well as of substantial public and private benefits. The speech at issue is speech that members of the public desire to hear. Indeed, it is most often the recipient, rather than the public employee, who initiates the dialogue in a language other than English. See Connick, 461 U.S. at 149, 103 S.Ct. at 1691 (judging whether speech is of "public concern" by assessing whether it would convey information of use to the public); Piver v. Pender County Bd. of Educ., 835 F.2d 1076, 1079-80 (4th Cir.1987) (quoting Berger v. Battaglia, 779 F.2d 992, 998-99 (4th Cir.1985) (citations omitted), cert. denied, Y487 U.S. 1206, 108 S.Ct. 2847, 101 L.Ed.2d 885 (1988) (stating that speech is of "public concern" based on whether the public wants to hear it)).
 
 
 71
 The practical effects of Article XXVIII's de facto bar on communications by or with government employees are numerous and varied. For example, monolingual Spanish-speaking residents of Arizona cannot, consistent with the article, communicate effectively with employees of a state or local housing office about a landlord's wrongful retention of a rental deposit, nor can they learn from clerks of the state court about how and where to file small claims court complaints.[25] They cannot obtain information regarding a variety of state and local social services, or adequately inform the service-givers that the governmental employees involved are not performing their duties properly or that the government itself is not operating effectively or honestly. Those with a limited command of English will face commensurate difficulties in obtaining or providing such information. Cf. Garcia v. Spun Steak, 998 F.2d 1480, 1488 (9th Cir.) (effect of English-only employment rule varies from workplace to workplace; in some circumstances it effectively may deny employees with limited proficiency in English the capacity to communicate on the job, and may therefore be invalid as applied to them), reh'g en banc denied, 13 F.3d 296 (1993), cert. denied, --- U.S. ----, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1994). Moreover, as we suggested earlier, the restrictions that Article XXVIII imposes severely limit the ability of state legislators to communicate with their constituents concerning official matters. For example, the provision would preclude a legislative committee from convening on a reservation and questioning a tribal leader in his native language concerning the problems of his community. A state senator of Navajo extraction would be precluded from inquiring directly of his Navajo-speaking constituents regarding problems they sought to bring to his attention. So would his staff. The legislative fact-finding function would, in short, be directly affected.
 
 
 72
 Because Article XXVIII bars or significantly restricts communications by and with government officials and employees, it significantly interferes with the ability of the non-English-speaking populace of Arizona " 'to receive information and ideas.' " Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748, 757, 96 S.Ct. 1817, 1823, 48 L.Ed.2d 346 (1976) (quoting Kleindienst v. Mandel, 408 U.S. 753, 762-63, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972)). As the Court explained in Virginia Citizens, "freedom of speech 'necessarily protects the right to receive.' " Id.; see also Board of Educ., Island Trees Union Free School Dist. No. 26 v. Pico, 457 U.S. 853, 866-68, 102 S.Ct. 2799, 2807-09, 73 L.Ed.2d 435 (1982); Procunier v. Martinez, 416 U.S. 396, 408-09, 94 S.Ct. 1800, 1808-09, 40 L.Ed.2d 224 (1974); Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969); Lamont v. Postmaster General, 381 U.S. 301, 307-08, 85 S.Ct. 1493, 1496-97, 14 L.Ed.2d 398 (1965) (Brennan, J., concurring); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (invalidating statute prohibiting teaching of foreign languages in part because it interfered "with the opportunities of pupils to acquire knowledge"). Although Virginia Citizens is not controlling here because it involved a restriction on the speech of a private entity that willingly provided information to the public,[26] the "right to receive" articulated in Virginia Citizens and related cases is clearly relevant in public employee speech cases. Any doubt concerning this point was removed in the National Treasury Employees Union case. There, the Court expressly invoked Virginia Citizens in striking down a public employee speech restriction.
 
 
 73
 The large-scale disincentive to government employees' expression also imposes a significant burden on the public's right to read and hear what the employees would otherwise have written and said. See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 756-757, 96 S.Ct. 1817, 1822-1823, 48 L.Ed.2d 346 (1976). We have no way to measure the true cost of that burden, but we cannot ignore the risk that it might deprive us of the work of a future Melville or Hawthorne.
 
 
 74
 National Treasury Employees Union, --- U.S. at ----, 115 S.Ct. at 1015 (footnote omitted). Thus, National Treasury Employees Union makes it clear that public employee speech doctrine weighs heavily the public's "right to receive information and ideas" by affording First Amendment protection to speech that the public has an interest in receiving. See Connick, 461 U.S. at 149, 103 S.Ct. at 1691; Pickering, 391 U.S. at 571-72, 88 S.Ct. at 1736; Piver, 835 F.2d at 1079-80. In applying these principles, we note that the speech at issue here, mundane though it may be, is of far more direct significance to the public than was the speech referred to in National Treasury Employees Union.
 
 
 75
 Article XXVIII obstructs the free flow of information and adversely affects the rights of many private persons by requiring the incomprehensible to replace the intelligible. Under its provisions, bilingual public employees will be aware that in many instances the only speech they may lawfully offer may be of no value. The article effectively requires that these employees remain mute before members of the non-English speaking public who seek their assistance. At such moments of awkward silence between government employees and those they serve, it will be strikingly clear to all concerned that vital speech that individuals desire both to provide and to hear has been stifled by the state.
 
 4.
 
 76
 The Absence of Any State Interest In Efficiency and
 
 Effectiveness
 
 77
 In light of the interests of both public employees and members of the public in the prohibited speech, a decision as to the constitutionality of Article XXVIII's restrictions involves at a minimum a weighing and balancing process similar to that conducted in the more traditional cases involving public employee speech of "public concern".[27] Here, the efficiency and effectiveness considerations that constitute the fundamental governmental interest in the usual "public concern" cases--and that provide the justification against which the employee's First Amendment interests must be weighed--are wholly absent. Indeed, as the parties acknowledged in the stipulation of uncontested facts, Arizona's interest in the efficiency and effectiveness of its workforce runs directly counter to Article XXVIII's restriction on public employee speech. See note 4, supra.
 
 
 78
 Specifically, the facts of this case unequivocally establish that Yniguez's use of Spanish in the course of her official duties contributed to the efficient and effective administration of the State. See Statement of Stipulated Facts at 5-6. More generally, the facts of this case, as well as elementary reason, tell us that government offices are more efficient and effective when state and local employees are permitted to communicate in languages other than English with consumers of government services who are not proficient in that language. Id. (stating that use of non-English languages promotes the "efficient administration of the State"); Cota v. Tucson Police Dept., 783 F.Supp. 458, 462 (D.Ariz.1992) (emphasizing that "the availability of Spanish-speaking personnel is necessary for effective performance of [the Tucson Police Department's] mission").
 
 
 79
 Additionally, as we explained earlier, if the purpose of Article XXVIII were to promote efficiency, it would not impose a total ban but would provide that languages other than English may be used in government business only when they facilitate such business and not when they hinder it. Article XXVIII plainly does not make this distinction. See, supra, at 928-29.
 
 
 80
 On this point, we note that Arizonans for Official English's assertion that government inefficiency and "chaos" will result from Article XXVIII's invalidation is not only directly contrary to the stipulated facts but is predicated upon a wholly erroneous assumption as to the nature of Yniguez's claim. The group contends that appellees seek the right to speak another language at will and regardless of whether the intended recipient of the speech primarily speaks that language or is even able to comprehend it. However, such a "right" would be of a far different order than the right at issue here. As the facts show, Yniguez spoke Spanish with Spanish-speaking claimants and English with English-speaking claimants. She does not claim any right to "choose" to speak Spanish with claimants who would not understand her, nor would this or any other court uphold such a right. Accordingly, in the interests of clarity, we emphasize that by ruling that the state cannot unreasonably limit the use of non-English languages, we do not imply that the state is therefore forced to allow inappropriate or burdensome language uses. In short, we do not suggest that a public employee has a "right" to speak in another language when to do so would hinder job performance. Cf. Jurado v. Eleven-Fifty Corp., 813 F.2d 1406 (9th Cir.1987) (Title VII not violated by radio station's firing of announcer who refuses to follow programming format and insists on speaking in Spanish). We merely consider here the lawfulness of speech in languages other than English that furthers the state's traditional interest in efficiency and effectiveness.
 
 5.
 
 81
 The Propriety of Considering State Justifications Other Than
 
 Efficiency and Effectiveness
 
 82
 Because the speech at issue here does not adversely affect the state's interest in efficiency and effectiveness, and because the Waters/ Pickering line of cases limits consideration of the governmental interest to these concerns, were we to apply the traditional Waters/ Pickering balancing test, Arizonans for Official English would lose by default. There would be nothing on the non-free speech side of the scale. There have, however, been a number of other cases in which the Court (though sometimes giving some weight to efficiency and effectiveness concerns) has considered primarily the government's argument that a broader set of justifications supports a particular restriction on the First Amendment rights of public employees.
 
 
 83
 Most of the cases in which the government has relied on justifications other than efficiency and effectiveness have involved patronage practices, although some have involved restrictions on public employees' political activities. See, e.g., Rutan v. Republican Party of Illinois, 497 U.S. 62, 70-76 & n. 4, 110 S.Ct. 2729, 2735-37 & n. 4, 111 L.Ed.2d 52 (1990) (citing, inter alia, interest in preventing excessive political fragmentation and strengthening party system); Elrod v. Burns, 427 U.S. 347, 364-69, 96 S.Ct. 2673, 2685-88, 49 L.Ed.2d 547 (1976) (citing, inter alia, interest in preserving the democratic process); Civil Service Comm'n v. Letter Carriers, 413 U.S. 548, 565, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796 (1973) (citing, inter alia, interest in preventing development of a powerful and corrupt political machine). In those cases, the government has relied on the broader concerns that "the government might have in the structure and functioning of society as a whole." Rutan, 497 U.S. at 70 n. 4, 110 S.Ct. at 2735 n. 4. In other words, the concerns on which the government has relied do not relate to ensuring an efficient workplace but instead involve more general societal interests. In such cases, there is no substantial nexus between the alleged governmental interest and job performance.
 
 
 84
 In a recent Supreme Court case in which the government sought to justify a limitation on public employee First Amendment rights on the basis of broad governmental interests rather than on traditional efficiency and effectiveness concerns, the majority applied a strict scrutiny test and rejected the challenged governmental practices. The majority concluded that because the government's interests in the regulations were not "employment-related," there was no reason to relax the strict scrutiny ordinarily applied to restrictions on speech. Rutan, 497 U.S. at 70 n. 4, 110 S.Ct. at 2735 n. 4. By contrast, the dissenters applied a more permissive balancing test, asking: "can the governmental advantages of this employment practice reasonably be deemed to outweigh its 'coercive' effects?" Compare Rutan, 479 U.S. at 70-74 & n. 4, 110 S.Ct. at 2735-36 & n. 4 with id. at 96-104 & n. 3, 110 S.Ct. at 2749-52 & n. 3 (Scalia, J., dissenting). The dissenters adopted the premise that broader governmental interests were due no less deference than the governmental interest in efficiency and effectiveness.[28] Accordingly, the dissenters' approach essentially mimicked the Waters/ Pickering balancing test; it simply broadened the scope of that test to account for interests other than efficiency and effectiveness.
 
 
 85
 In an even more recent case, the Court invalidated a restriction on public employee speech without discussing the question of the applicable test, although it employed a balancing approach. See United States v. National Treasury Employees Union, --- U.S. ----, ---- - ----, 115 S.Ct. 1003, 1015-1018, 130 L.Ed.2d 964 (1995). In doing so, the Court did not even mention Rutan. Nor did it refer to or identify a specific level of scrutiny to be applied. Instead, it deemed it sufficient to evaluate the particular burdens imposed by the statute in light of the particular interests affected. Rather than fixing on superficially precise legal labels or formulae that are easily manipulated by sophisticated lawyers and judges, the Court conducted a thorough and judicious examination of the practical impact of the legislation involved, both positive and negative, and its effect on constitutionally protected interests. It then carefully weighed and balanced the various factors and reached its conclusion in a reasoned and measured manner. In doing so, it ably performed the quintessential function of judicial decision-making: the exercise of judgment.
 
 
 86
 The Court's approach in National Treasury Employees Union is consistent with the method of analysis we undertake. In any event, we need not decide what level of scrutiny or what approach to balancing is applicable here. Whether we apply strict scrutiny as suggested by Rutan, whether we use a form of balancing test similar to that advocated by the Rutan dissenters and modelled on the approach traditionally employed in the Waters/ Pickering line of cases, or whether we follow the course chosen by the Court in National Treasury Employees Union, the result is the same: The restrictions on free speech are not justified by the alleged state interests.
 
 6.
 
 87
 Evaluating the Alleged State Justifications
 
 
 88
 Arizonans for Official English claims, as it and others did when the initiative was on the ballot, that Article XXVIII promotes significant state interests. The organization enumerates these interests as: protecting democracy by encouraging "unity and political stability"; encouraging a common language; and protecting public confidence.
 
 
 89
 We note at the outset that the sweeping nature of Article XXVIII's restriction on public employee speech weighs significantly in our evaluation of the state's alleged interests. In National Treasury Employees Union, the Court explained that when the government seeks to defend a "wholesale deterrent to a broad category of expression by a massive number of potential speakers," --- U.S. at ----, 115 S.Ct. at 1013, its burden is heavier than when it attempts to defend an isolated disciplinary action. Id. Thus, we must examine the state's asserted justifications with particular care.
 
 
 90
 There is no basis in the record to support the proponents' assertion that any of the broad societal interests on which they rely are served by the provisions of Article XXVIII. We also note that the article itself contains no statement of findings that would suggest that it would serve the interests asserted by the appellants. The absence of any evidence to this effect is of particular significance given that the deference normally accorded legislative findings does not apply with the same force when "First Amendment rights are at stake." Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 841, 98 S.Ct. 1535, 1542, 56 L.Ed.2d 1 (1978). It is equally significant for a second reason--Article XXVIII is a ballot initiative and thus was subjected to neither extensive hearings nor considered legislative analysis before passage. Cf. United States Civil Service Commission v. National Association of Letter Carriers, 413 U.S. at 565-567, 93 S.Ct. at 2890-91 (noting the extensive legislative findings that supported the Hatch Act).
 
 
 91
 In plain fact, Arizonans for Official English offer us nothing more than "assertion and conjecture to supports its claim" that Article XXVIII's restrictions on speech would serve the alleged state interests. Landmark, 435 U.S. at 841, 98 S.Ct. at 1542; National Treasury Employees Union, --- U.S. at ----, 115 S.Ct. at 1017 (citing Turner Broadcasting System, Inc. v. FCC, 512 U.S. ----, ----, 114 S.Ct. 2445, 2450, 129 L.Ed.2d 497 (1994)). Accordingly, the appellants have not demonstrated that the benefits to be obtained outweigh the burdens imposed on First Amendment rights, particularly given the all-encompassing scope of the restriction they seek to defend. See National Treasury Employees Union, --- U.S. at ----, 115 S.Ct. at 1014 (explaining that the government's "burden is greater" in such cases).
 
 
 92
 We also reject the justifications for even more basic reasons. Our conclusions are influenced primarily by two Supreme Court cases from the 1920s in which nearly identical justifications were asserted in support of laws restricting language rights. See Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Farrington v. Tokushige, 273 U.S. 284, 47 S.Ct. 406, 71 L.Ed. 646 (1927). Meyer involved a Nebraska statute that prohibited the teaching of non-English languages to children under the eighth grade level; Tokushige, similarly, involved a Hawaii statute that singled out "foreign language schools," such as those in which Japanese was taught, for stringent government control.
 
 
 93
 In defending the statute at issue in Meyer, the state of Nebraska explained that "[t]he object of the legislation ... [is] to create an enlightened American citizenship in sympathy with the principles and ideals of this country." 262 U.S. at 393, 43 S.Ct. 625; see also id. at 398, 43 S.Ct. at 626 (asserting that purpose of law was to prevent children from having "inculcate[d] in them the ideas and sentiments foreign to the best interests of this country"); id. at 390, 43 S.Ct. 625 (noting that law was designed "to promote civic development," and inhibit the acquisition of "foreign ... ideals"). More recently, the Court explicitly characterized the language restriction in Meyer as designed "to promote civic cohesiveness by encouraging the learning of English." Epperson v. Arkansas, 393 U.S. 97, 105, 89 S.Ct. 266, 271, 21 L.Ed.2d 228 (1968). Despite these worthy goals, the Court ruled that the repressive means adopted to further them were "arbitrary" and invalid. Meyer, 262 U.S. at 403, 43 S.Ct. at 628.
 
 
 94
 Similarly, the provision at issue in Tokushige had the specific purpose of regulating language instruction "in order that the Americanism of the students may be promoted." 273 U.S. at 293, 47 S.Ct. at 407. As in Meyer, the Tokushige Court recognized the validity of the interests asserted in defense of the statute. 273 U.S. at 299, 47 S.Ct. at 409. Nonetheless, citing Meyer 's invalidation of the Nebraska law, it found that the statute's promotion of these interests was insufficient to justify infringing on the constitutionally protected right to educate one's children to become proficient in one's mother tongue.[29]
 
 
 95
 Meyer and Tokushige also demonstrate the weakness of the second justification for Article XXVIII proffered by Arizonans for Official English: that of encouraging a common language. In Meyer, the statute reflected the belief that "the English language should be and become the mother tongue of all children reared in this state." 262 U.S. at 398, 43 S.Ct. at 626. The statute in Tokushige would have similarly inhibited the spread of the Japanese language, presumably in favor of English. 273 U.S. at 298, 47 S.Ct. at 408. Although there is probably no more effective way of encouraging the uniform use of English than to ensure that children grow up speaking it,[30] both statutes were struck down on the ground that these interests were insufficient to warrant such restrictions on the use of foreign languages.
 
 
 96
 Like the Court in Meyer and Tokushige, we recognize the importance of (1) promoting democracy and national unity and (2) encouraging a common language as a means of encouraging such unity. See Guadalupe Organization, Inc., supra.[31] The two primary justifications relied on by the article's proponents are indeed closely linked. We cannot agree, however, that Article XXVIII is in any way a fair, effective, or appropriate means of promoting those interests, or that even under a more deferential analysis its severely flawed effort to advance those goals outweighs its substantial adverse effect on first amendment rights. As we have learned time and again in our history, the state cannot achieve unity by prescribing orthodoxy. See West Virginia Bd. of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); Meyer, 262 U.S. 390, 392, 43 S.Ct. 625 (argument of plaintiff) (forced "Americanization" violates American tradition of liberty and toleration). Notwithstanding this lesson, the provision at issue here "promotes" English only by means of proscribing other languages and is, thus, wholly coercive. Moreover, the goals of protecting democracy and encouraging unity and stability are at most indirectly related to the repressive means selected to achieve them. Next, the measure inhibits rather than advances the state's interest in the efficient and effective performance of its duties. Finally, the direct effect of the provision is not only to restrict the rights of all state and local government servants in Arizona, but also to severely impair the free speech interests of a portion of the populace they serve.
 
 
 97
 We should add that we are entirely unmoved by the third justification--that allowing government employees to speak languages other than English when serving the public would undermine public confidence and lead to "disillusionment and concern." To begin with, it is clear that the non-English speaking public of Arizona would feel even greater disillusionment and concern if their communications with public employees and, effectively, their access to many government services, were to be barred by Article XXVIII. Moreover, numerous cases support the notion that the interest in avoiding public hostility does not justify infringements upon constitutional rights. See e.g., Buchanan v. Warley, 245 U.S. 60, 79-81, 38 S.Ct. 16, 20, 62 L.Ed. 149 (1917) (possibility of race conflict does not justify housing segregation); Palmore v. Sidoti, 466 U.S. 429, 433-34, 104 S.Ct. 1879, 1882-83, 80 L.Ed.2d 421 (1984) (society's racial animus not legitimate factor to consider in awarding custody of child). In short, the "concern" that some members of the Arizona public may feel over the use of non-English languages provides no basis for prohibiting their use no matter the degree of scrutiny we apply.
 
 
 98
 Here, the full costs of banning the dissemination of critical information to non-English speaking Arizonans cannot readily be calculated. There would undoubtedly be severe adverse consequences which even the sponsors of Article XXVIII neither foresaw nor intended. The range of potential injuries to the public is vast. Much of the information about essential governmental services that, but for the initiative, would be communicated in a manner that non-English speaking Arizonans could comprehend may not be susceptible to timely transmission by other means. By comparison, the benefits that the initiative purports to offer are minimal, especially in light of the state's concession that its interests in "efficiency" and "effectiveness" are not served by the Article. Thus, under a balancing test, whether identified as a Waters/ Pickering type of test, a test modelled after that standard, as employed by the dissenters in Rutan, or the National Treasury Employees Union approach to balancing, Article XXVIII must be held unconstitutional. A fortiori, the article could not survive a traditional strict scrutiny test. We reach our conclusions only after giving full consideration to the governmental interest in controlling the content and manner of the speech of its employees in the performance of their work assignments. Here, however, that interest, when balanced against the considerations we have examined, cannot outweigh the free speech interests impaired by Article XXVIII.
 
 E.
 Conclusion
 
 99
 To conclude, Article XXVIII is not a valid regulation of the speech of public employees and is unconstitutionally overbroad. By prohibiting public employees from using non-English languages in performing their duties, the article unduly burdens their speech rights as well as the speech interests of a portion of the populace they serve. The article similarly burdens the First Amendment rights of state and local officials and officers in the executive, legislative, and judicial branches.
 
 
 100
 We note that the adverse impact of Article XXVIII's over-breadth is especially egregious because it is not uniformly spread over the population, but falls almost entirely upon Hispanics and other national origin minorities. Cf. Spun Steak, 998 F.2d at 1486 (English-only rule in the workplace may disproportionately affect Hispanic employees); see generally NAACP v. City of Richmond, 743 F.2d 1346, 1356 (9th Cir.1984) (holding, in case involving restriction on NAACP march against racist police practices, that courts "must examine restrictions on speech with particular care when their effects fall unevenly on different ... groups in society"); Tribe, supra, at 979. Since language is a close and meaningful proxy for national origin,[32] restrictions on the use of languages may mask discrimination against specific national origin groups or, more generally, conceal nativist sentiment. See, e.g., Yu Cong Eng v. Trinidad, 271 U.S. 500, 528, 46 S.Ct. 619, 626, 70 L.Ed. 1059 (1926) (statute prohibiting keeping of account books in any language other than English or Spanish denies equal protection of law to Chinese merchants); Lau v. Nichols, 414 U.S. 563, 566-69, 94 S.Ct. 786, 788-90, 39 L.Ed.2d 1 (1974) (recognizing right under Title VI of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000d, of non-English-speaking Chinese students to receive bilingual compensatory education, because "students who do not understand English are effectively foreclosed from any meaningful education"); Asian American Business Group v. City of Pomona, 716 F.Supp. 1328, 1332 (C.D.Cal.1989) (law restricting use of non-English alphabetical characters discriminates on basis of national origin); Hernandez v. Erlenbusch, 368 F.Supp. 752, 755-56 (D.Or.1973) (tavern's English-only rule constitutes illegal discrimination against Mexican-American patrons); Califa, Declaring English the Official Language: Prejudice Spoken Here, 24 Harv.C.R.-C.L.L.Rev. 293, 325, 328 n. 225 (1989); Note, A Trait-Based Approach to National Origin Claims Under Title VII, 94 Yale L.J. 1164, 1165 & n. 5 (1985). In light of these considerations, the equal protection ramifications of Article XXVIII's restrictive impact strongly support our holding, as well.[33]
 
 
 101
 As President Franklin D. Roosevelt once remarked, "all of our people all over the country, all except the pure-blooded Indians, are immigrants or descendants of immigrants, including those who came over on the Mayflower." N.Y. Times, Nov. 5, 1944, at 38. Many and perhaps most immigrants arrived in the United States speaking a language other than English. Nonetheless, this country has historically prided itself on welcoming immigrants with a spirit of tolerance and freedom--and it is this spirit, embodied in the Constitution, which, when it flags on occasion, courts must be vigilant to protect.
 
 
 102
 In closing, we note that tolerance of difference--whether difference in language, religion, or culture more generally--does not ultimately exact a cost. To the contrary, the diverse and multicultural character of our society is widely recognized as being among our greatest strengths. Recognizing this, we have not, except for rare repressive statutes such as those struck down in Meyer, Bartels, Yu Cong Eng, and Farrington, tried to compel immigrants to give up their native language; instead, we have encouraged them to learn English. The Arizona restriction on language provides no encouragement, however, only compulsion: as such, it is unconstitutional.
 
 IV.
 Nominal Damages
 
 103
 Finally, we must consider the question of Yniguez's right to nominal damages. The State of Arizona expressly waived its right to assert the Eleventh Amendment as a defense to the award of nominal damages. In Carey v. Piphus, 435 U.S. 247, 266-67, 98 S.Ct. 1042, 1053-54, 55 L.Ed.2d 252 (1978), the leading case on this issue, the Supreme Court held that plaintiffs in a Sec. 1983 action were entitled to nominal damages for the deprivation of their due process rights even without proof of actual injury. The Court explained that:
 
 
 104
 [c]ommon-law courts traditionally have vindicated deprivations of certain absolute rights that are not shown to have caused actual injury through the award of a nominal sum of money. By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed.
 
 
 105
 Id.; see also Lokey v. Richardson, 600 F.2d 1265, 1266 (9th Cir.1979), cert. denied, 449 U.S. 884, 101 S.Ct. 238, 66 L.Ed.2d 110 (1980).
 
 
 106
 The right of free speech, like that of due process of law, must be vigorously defended. Indeed, the protection of First Amendment rights is central to guaranteeing society's capacity for democratic self-government. See Meiklejohn, Free Speech and Its Relation to Self-Government (1948); New York Times v. Sullivan, 376 U.S. 254, 269-70, 84 S.Ct. 710, 720-21, 11 L.Ed.2d 686 (1964). Thus, even without proof of actual injury, Yniguez is entitled to nominal damages for prevailing in an action under 42 U.S.C. Sec. 1983 for the deprivation of First Amendment rights. See Nakao v. Rushen, 635 F.Supp. 1362, 1364 n. 5 (N.D.Cal.1986).[34]
 
 V.
 Conclusion
 
 107
 We affirm the district court's judgment that Article XXVIII of the Arizona Constitution is facially overbroad and violates the First Amendment, and that the article is unconstitutional in its entirety. We reverse and remand the district court judgment insofar as it denies Yniguez an award of nominal damages.
 
 
 108
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 APPENDIX
 
 109
 ARTICLE XXVIII. ENGLISH AS THE OFFICIAL LANGUAGE
 
 
 110
 1. English as the Official Language; Applicability.
 
 
 111
 Section 1. (1) The English language is the official language of the State of Arizona.
 
 
 112
 (2) As the official language of this State, the English language is the language of the ballot, the public schools and all government functions and actions.
 
 
 113
 (3)(a) This Article applies to:
 
 
 114
 (i) the legislative, executive and judicial branches of government,
 
 
 115
 (ii) all political subdivisions, departments, agencies, organizations, and instrumentalities of this State, including local governments and municipalities,
 
 
 116
 (iii) all statutes, ordinances, rules, orders, programs and policies,
 
 
 117
 (iv) all government officials and employees during the performance of government business.
 
 
 118
 (b) As used in this Article, the phrase "This state and all political subdivisions of this State" shall include every entity, person, action or item described in this Section, as appropriate to the circumstances.
 
 
 119
 2. Requiring This State to Preserve, Protect and Enhance English.
 
 
 120
 Section 2. This State and all political subdivisions of this State shall take all reasonable steps to preserve, protect and enhance the role of the English language as the official language of the state of Arizona.3. Prohibiting This State from Using or Requiring the Use of Languages Other Than English; Exceptions.
 
 
 121
 Section 3. (1) Except as provided in Subsection (2):
 
 
 122
 (a) This State and all political subdivisions of this State shall act in English and no other language.
 
 
 123
 (b) No entity to which this Article applies shall make or enforce a law, order, decree or policy which requires the use of a language other than English.
 
 
 124
 (c) No governmental document shall be valid, effective or enforceable unless it is in the English language.
 
 
 125
 (2) This State and all political subdivisions of this State may act in a language other than English under any of the following circumstances:
 
 
 126
 (a) to assist students who are not proficient in the English language, to the extent necessary to comply with federal law, by giving educational instruction in a language other than English to provide as rapid as possible a transition to English.
 
 
 127
 (b) to comply with other federal laws.
 
 
 128
 (c) to teach a student a foreign language as a part of a required or voluntary educational curriculum.
 
 
 129
 (d) to protect public health or safety.
 
 
 130
 (e) to protect the rights of criminal defendants or victims of crime.
 
 
 131
 4. Enforcement; Standing.
 
 
 132
 Section 4. A person who resides in or does business in this State shall have standing to bring suit to enforce this Article in a court of record of the State. The Legislature may enact reasonable limitations on the time and manner of bringing suit under this subsection.
 
 BRUNETTI, Circuit Judge, concurring:
 
 133
 I agree that Article XXVIII of the Arizona Constitution is facially invalid and I join in the majority opinion. I write separately to emphasize that the article's unconstitutional effect on Arizona's elected officials would alone be sufficient reason to strike the provision down.
 
 I.
 
 134
 As indicated in the majority opinion, the government employees affected by the article's unconstitutional limitations outnumber the elected officials affected. However, the extent of the damage caused by Article XXVIII's restrictions on elected officials is not diminished by the fact that their population is smaller than that of government employees.
 
 
 135
 Article XXVIII offends the First Amendment not merely because it attempts to regulate ordinary political speech, but because it attempts to manipulate the political process by regulating the speech of elected officials. Freedom of speech is the foundation of our democratic process, and the language restrictions of Article XXVIII stifle informative inquiry and advocacy by elected officials. By restricting the free communication of ideas between elected officials and the people they serve, Article XXVIII threatens the very survival of our democratic society.
 
 
 136
 To begin with, Article XXVIII interferes with the ability of candidates for re-election to communicate with voters. These First Amendment protections are equally applicable to all candidates, not simply those running for re-election. However, I address specifically candidates running for re-election because Article XXVIII only affects elected officials.
 
 
 137
 A candidate must be able to communicate with voters in order for voters to make an informed decision about whether to cast their ballot for that candidate. Indeed, the Supreme Court has said:
 
 
 138
 Legislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they may be represented in governmental debates by the person they have elected to represent them.
 
 
 139
 Bond v. Floyd, 385 U.S. 116, 136-37, 87 S.Ct. 339, 349-50, 17 L.Ed.2d 235 (1966). Communication between candidates and voters is at the core of all political action. The First Amendment prevents the disenfranchisement that results when candidates for re-election are disabled from communicating with any certain group.
 
 
 140
 Article XXVIII not only interferes with a voter's ability to assess candidates, but it also interferes with officials' ability to represent their constituents once they are elected. "The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy." Id. at 135-36, 87 S.Ct. at 349. Elected representatives cannot fully serve their constituents if they are precluded from fully expressing their views to, and learning the views of, those constituents. The First Amendment precludes a successful electoral majority from restricting political communications with a certain segment of the electorate.
 
 
 141
 In addition to interfering with voting and political representation, Article XXVIII attempts to reconfigure the political landscape. Language is at the foundation of the cultural and ethnic diversity in our democratic and political processes, and is inextricably intertwined therein. Article XXVIII attempts to impose political conformity by requiring that the same language be used for all political and governmental dialogue. See Legislative Council Arguments Favoring Proposition 106, at 26 (describing the need to "reverse the trend" of "language rivalries" by requiring discourse in English only).
 
 
 142
 It does not take much "judicial prediction or assumption[,]" Broadrick v. Oklahoma, 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973), to conclude that Article XXVIII impermissibly chills elected officials' speech. Under principles of third-party standing in the First Amendment area, Yniguez's overbreadth claim permits this panel to examine Article XXVIII's impact on elected officials. See id. The harm to society from such unconstitutional interference with the democratic process requires that the article be struck down as facially overbroad. Accordingly, I would hold that Article XXVIII's unconstitutional restriction on elected officials' speech is sufficient to find facial overbreadth.
 
 II.
 
 143
 That being said, I agree with the other members of the majority that the article is also unconstitutional and facially overbroad for the independent reason that it restricts the speech of government employees, such as Yniguez. While I feel there may be some tension between the public interest in receiving Yniguez's public services in Spanish as described by the majority, and our prior cases which hold that there is no right to receive government services in a language other than English, our holding today does not conflict with those prior cases. See, e.g., Carmona v. Sheffield, 475 F.2d 738, 739 (9th Cir.1973) (no right to unemployment notice in Spanish); Soberal-Perez v. Heckler, 717 F.2d 36, 41-43 (2d Cir.1983) (no right to Social Security notices and services in Spanish), cert. denied, 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984).
 
 
 144
 As the majority carefully describes, we are only considering the interest of the public in receiving speech when government employees exercise their right to utter such speech, and we do not create an independently enforceable public right to receive information in another language. Our consideration of the public's interest in receiving Yniguez's speech is dictated by the Waters/ Pickering test. Under the Waters/ Pickering test, we must balance " 'the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " United States v. National Treasury Employees Union, --- U.S. ----, ----, 115 S.Ct. 1003, 1012, 130 L.Ed.2d 964 (1995) (quoting Pickering v. Board of Ed. of Township High School Dist., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968)) (alteration in original). The public's interest in receiving Yniguez's speech weighs in on both sides of the test.
 
 
 145
 Speech touches a matter of public concern if the community that constitutes the speaker's audience has an interest in receiving that speech. Cf. Connick v. Myers, 461 U.S. 138, 148, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983) (finding that certain speech was not a matter of public concern because "[speaker] did not seek to inform the public"); id. at 148, 103 S.Ct. at 1690 (relying on this country's "demonstrated interest" regarding the subject matter of other speech to conclude that the subject matter was one of public concern). When determining whether an employee's speech addresses a matter of public concern, we look to "the content, form, and context of a given statement, as revealed by the record as a whole." Id. at 147-48, 103 S.Ct. at 1690. In this case, the parties stipulated that Yniguez communicates the Risk Management Division's dispositions of malpractice claims in Spanish to persons who are only able to speak in Spanish, persons whose English is not well-developed, and persons who are unable to understand the English language to comprehend the legal import of the document they are signing. Those claimants clearly have an interest in receiving information about their claims in Spanish since they would not otherwise be able to understand the information. Therefore, Yniguez's Spanish language communications touch matters of public concern.
 
 
 146
 On the efficiency side of the Waters/ Pickering balance, the public's interest in receiving Yniguez's communications is once again an important factor. If a recipient of Yniguez's information did not have an interest in receiving the information in Spanish, it would not be efficient for Yniguez to communicate with that person in Spanish. For example, if Yniguez's audience was a mono-lingual English-speaker, undeniably it would be inefficient for her to talk to that person in Spanish. But that is not the situation here. The parties in this case stipulated that Yniguez only speaks Spanish to mono-lingual Spanish-speakers, or people whose "English language [skills] were not sufficiently well-developed to understand all of the English language expressions and ideas which [Yniguez] desired to communicate." Use of Spanish under these circumstances, as the parties stipulated, "contributes to the efficient operation of the State."
 
 
 147
 Under the facts of this case, the public interest in Yniguez's use of Spanish is a necessary consideration under the Waters/ Pickering test. Consideration of the public's interest in receiving Yniguez's Spanish language communications is only for the purpose of establishing her right to speak, not of establishing the public's right to receive. Yniguez's Spanish-speaking audience has an interest in listening to her Spanish-language speech, and that interest helps define her right to speak in Spanish. Nowhere is it implied that her audience has a right to hear her, or any other government employee, speak in Spanish.
 
 
 148
 REINHARDT, Circuit Judge, concurring specially:
 
 
 149
 Judge Kozinski's separate dissent requires separate comment. In the latest chapter of his crusade against the use of languages other than English in public, it is what Judge Kozinski does not say that is most revealing. My learned colleague, who is surely expert in these matters by now, ignores completely the constitutional interests of the numerous non-English speakers. There is nothing novel about the fact that the interests of the audience as well as of the speaker are protected by the First Amendment. Yet Judge Kozinski does not even mention, let alone discuss Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), or United States v. National Treasury Employees Union, --- U.S. ----, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), decisions that make it clear that in dealing with First Amendment questions we must consider the needs of the audience. In fact, the constitutional interests of the public are at their height when its members seek information of vital importance from the government. In the end, then, it is the interests of non-English speaking persons, often poor and uneducated, that are so compelling here.
 
 
 150
 If Judge Kozinski had his way, bilingual government clerks would not be able to advise persons who can speak only Spanish--or Chinese or Navajo--how to apply for food stamps, or aid for their children, or unemployment or disability benefits. Public employees would be prohibited from helping non-English speaking residents file complaints against those who mistreat them or who violate their rights or even from helping them secure driver's licenses or permits to open small businesses. Bilingual traffic officers would not be able to give directions to nearby medical clinics or schools. Migrant farm workers who cannot speak English would find themselves cut off from almost all government assistance by an impenetrable language barrier. Recent immigrants in general, including many who fled persecution, would find their lives in their adopted land unduly harsh and bewildering. Yet, not a word of concern for the less fortunate among us finds its way into Judge Kozinski's constitutional analysis.
 
 
 151
 At the same time that Judge Kozinski callously ignores the interests of people, he stretches eagerly to place the powers of the government, in its role as speaker, beyond the reach of the Constitution. Indeed, it is the rights of the government that Judge Kozinski stresses at every opportunity. If Judge Kozinski had his druthers, public employees would be stripped of all First Amendment rights while performing their governmental functions.[1] There would be nothing that Government--from the tiniest municipality on up--could not compel its employees to say, no matter how racist or abhorrent, and nothing that Government could not fire its employees for saying, no matter how innocuous. His would be an Orwellian world in which Big Brother could compel its minions to say War is Peace and Peace is War, and public employees would be helpless to object. It would not matter whether government had a legitimate purpose or even whether it had a purpose at all.
 
 
 152
 The difference between the majority's view and Judge Kozinski's is simple. The majority says that under the First Amendment there are limits to what the government can force its employees or officials to say in the course of performing their official duties while Judge Kozinski says that there are none. To me, unlimited government power in any form is a foreign notion indeed.
 
 
 153
 Judge Kozinski does Abraham Lincoln no honor by seeking to enlist his words in support of a mean-spirited, nativist measure--a measure that would create so much division and ill will and that would so severely penalize those among us who are unable to communicate in English. The end result of Judge Kozinski's legal approach would be to punish people who are not as fortunate or as well educated as he--people who are neither able to write for nor read the Wall Street Journal, and indeed would have little cause to do either.
 
 
 154
 Nor does Judge Kozinski advance his cause by disingenuously suggesting that his argument is a limited one, that the Arizona initiative might be unlawful for other reasons--just not on First Amendment grounds. Judge Kozinski has previously argued that languages other than English should be banished from the public arena. He openly favors conformity over diversity and would "preserv[e] native tongues and dialects for private and family gatherings." Gutierrez v. Mun. Ct. Of S.E. Judicial Dist., 861 F.2d 1187, 1193 (9th Cir.1988) (Kozinski, dissenting). Judge Kozinski's view of the rights of non-English speaking persons would make the Statue of Liberty weep. The divided house that Judge Kozinski fears is a world in which Spanish, Chinese, or Navajo is heard in public, a world in which individual liberty rather than government-mandated orthodoxy thrives.
 
 
 155
 Judge Kozinski trots out a parade of horribles that he insists will come to haunt us if we do not accept his absolutist, authoritarian view. All his examples are absurd. No court in this country would protect a government employee who adopted one of the outlandish stances that Judge Kozinski so casuistically suggests. Were we to withhold rights from individuals because clever judges could conjure up hypothetical examples of frivolous law suits, there would soon be no rights left at all. Scare tactics are hardly a novel technique in my talented colleague's arsenal of en banc dissents. Recently, he warned that the majority opinion in another en banc case was a disaster of nearly unprecedented proportions, in fact a "tsunami." U.S. v. Gaudin, 28 F.3d 943, 955 (9th Cir.1994) (Kozinski, dissenting). In Gaudin, he wrote: "It's not every day, after all, that we provoke a conflict with every other regional circuit, defy Supreme Court authority, implicitly overrule several lines of our own case law--thereby creating a spider web of secondary circuit conflict...." Id. The majority held firm. The decision that Judge Kozinski so vehemently denounced was affirmed soon thereafter by the United States Supreme Court by a vote of 9-0. U.S. v. Gaudin, --- U.S. ----, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).
 
 
 156
 The true horror of this case is what could happen if Judge Kozinski's view prevailed. Government employees could be compelled to parrot racist and sexist slogans, to hurl hateful invective at non-English speaking people asking for assistance, to publicly declare their loyalty to political parties, and to bow toward the national or state capitol three times a day--and the First Amendment would offer them no protection whatsoever. Under Judge Kozinski's approach, non-English speakers would be relegated to second class status, deprived of information they desperately need to meet the basic necessities of their daily lives, and grievously handicapped in their efforts to pursue the American dream. It would be a sad day indeed for the Constitution were we to betray our nation's history and uphold a measure that is so alien to America's most basic traditions.
 
 
 157
 FERNANDEZ, Circuit Judge, with whom Chief Judge WALLACE and Judges HALL and KLEINFELD join, dissenting:
 
 
 158
 The State of Arizona, through its initiative process, added Article XXVIII to the State's constitution. That Article made English the official language of "the public schools and all government functions and actions." Ariz. Const. art. XXVIII, Sec. 1(2). It also directed that the State and all of its political subdivisions shall "act in English and in no other language," except in a handful of instances. Id. at Sec. 3. The Article applies to "all government officials and employees during the performance of government business." Id. at Sec. 1(3)(a)(iv). Maria-Kelley F. Yniguez[1] does not like Article XXVIII as a matter of policy. I can understand and sympathize with that. It is when she goes beyond the realm of policy and seeks to show that the Article violates the First Amendment to the United States Constitution that she goes astray. It is there that we part company.
 
 
 159
 She, in effect, proceeds from the fundamentally flawed assumption that while performing government business an official[2] or employee has much the same freedom as a private citizen. That leads her into a thicket of incorrect assumptions and assertions about the nature of her speech rights, the nature of language,[3] and the rights and duties of the State when it chooses to speak for itself. As a result, she has left the proper analytical pathway and become hopelessly lost in a forest of her own hopes.
 
 
 160
 I believe that a relatively brief explanation of the relevant constitutional principles will adumbrate the proper path and show that Article XXVIII does not violate Yniguez's First Amendment rights.[4] In so doing I will assume, without deciding, that Article XXVIII is just as broad as it appears on its face and that it will, indeed, preclude Yniguez and other employees and officers of the State from speaking in a language other than English when performing state business, unless one of the special exceptions applies.
 
 
 161
 There can be no doubt that a public employee, like Yniguez, does not have a full panoply of freedoms to do what she likes when she is performing her job. On the contrary, the State can place numerous restrictions upon its employees. The very nature of the employment relationship allows that. For example, even were it assumed that "the citizenry at large has some sort of 'liberty' interest within the Fourteenth Amendment in matters of personal appearance," an employee may be restricted unless the regulation "is so irrational that it may be branded 'arbitrary.' " Kelley v. Johnson, 425 U.S. 238, 244, 248, 96 S.Ct. 1440, 1444, 1446, 47 L.Ed.2d 708 (1976). Similarly, a citizen's Fourth Amendment privacy rights may be limited at his place of work. See O'Connor v. Ortega, 480 U.S. 709, 724-25, 107 S.Ct. 1492, 1501, 94 L.Ed.2d 714 (1987). And even restrictions that reach beyond the job itself to activities outside the workplace may be proper. See United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 557-65, 93 S.Ct. 2880, 2886-90, 37 L.Ed.2d 796 (1973) (political campaigning or officeholding); cf. United States v. National Treasury Employees Union, --- U.S. ----, ---- - ----, 115 S.Ct. 1003, 1013-15, 130 L.Ed.2d 964 (1995) (at least persons who are not senior executive officers, members of Congress, or judges cannot be subjected to a blanket ban on honoraria when they address "a public audience ... outside the workplace, and [the] content [is] largely unrelated to their government employment").
 
 
 162
 It is true that we have come some way since Holmes, then a Justice of the Supreme Court of Massachusetts, wrote that "[a policeman] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." McAuliffe v. Mayor of New Bedford, 155 Mass. 216, 29 N.E. 517, 517 (1892). Still and all, as demonstrated by our continued restrictions on political action, we have not entirely abandoned even that concept. It is also true that " 'the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.' " Keyishian v. Board of Regents, 385 U.S. 589, 605-06, 87 S.Ct. 675, 685, 17 L.Ed.2d 629 (1967); see also Wieman v. Updegraff, 344 U.S. 183, 191-92, 73 S.Ct. 215, 218-19, 97 L.Ed. 216 (1952) (oath regarding joining a revolutionary political party). But none of this is helpful to Yniguez, for the erosion of the restrictions upon employees has taken place in the area of their activities while they are not performing government functions. Membership in a political party or engaging in nongovernmental writing or other private activities is not the performance of a government function.
 
 
 163
 The distinction cuts closer to the bone when the Supreme Court's treatment of public versus private speech is considered. I will not go through the extensive history of that jurisprudence because its details have little to do with this case. The law in that area keys on the content of the speech itself. That is, was the speech on a matter of public concern or was it on a matter of private concern? See, e.g., Waters v. Churchill, --- U.S. ----, ----, 114 S.Ct. 1878, 1887, 128 L.Ed.2d 686 (1994). Here, the issue involves the language used, not the public or private concern content of the language. An employee might well speak out on a matter of public concern in any language, or might simply engage in private-concern grumbling or disruption in any language. The language does not, in the sense used here, change the content at all.
 
 
 164
 What is important, however, is the Supreme Court's description of the strength of the government's interests and the scope of a government employee's First Amendment rights. If the matter involved is not one of public concern, the court has left the matter almost entirely in the hands of the employing authority. As the Court said in Connick v. Myers, 461 U.S. 138, 146-47, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983):
 
 
 165
 [I]f Myers' questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge. When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.
 
 
 166
 ....
 
 
 167
 [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.... Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the State.
 
 
 168
 The Court went on to say that not "all matters which transpire within a government office are of public concern...." Id. at 149, 103 S.Ct. at 1691. See also Waters, --- U.S. at ----, 114 S.Ct. at 1886-87 (1994).
 
 
 169
 It is worthy of note that even if the speech is of public concern, the employee does not have all of the freedom of speech of a private citizen. The government can still discipline the employee in the name of efficiency and the like if the government's interests in promoting those other concerns outweigh the employee's interest in speaking out. See, e.g., id. at ---- - ----, 114 S.Ct. at 1887-88; Connick, 461 U.S. at 149-54, 103 S.Ct. at 1691-93; Pickering v. Board of Educ., 391 U.S. 563, 568-71, 88 S.Ct. 1731, 1734-36, 20 L.Ed.2d 811 (1968). It is from this public concern balancing that Yniguez seeks to draw substantial support because the State has conceded that her speaking in a language other than English would often be more efficient. But efficiency is not the point because this is not a public concern speaking-out case. Nor, as I have said, do I think it is exactly a private concern case. In fact, none of the Supreme Court decisions regarding public or private concern speech involved an employee who was hired to speak for the government and who performed that function in a manner contrary to her instructions.
 
 
 170
 However, if I were forced to place this case in one pigeonhole or the other, I would say that it is more like a case of private concern speech. The simple fact is that the State, through its constitution, has determined that its work will be done in English, and Yniguez, for her own private reasons, does not wish to obey that determination. At any rate, unless one is thoroughly committed to the economic theory of law, which I am not, one must agree that more than efficiency drives the policies of government. Indeed, as most dictators seem to believe, freedom itself can be very very inefficient.
 
 
 171
 Yniguez nevertheless argues that her use of a language of her choice to perform the State's business cannot be restricted. It can be said that each language has a content of its own and that languages are a mode of expressing ideas. Yniguez argues that because words are the skins of ideas, the content of what is said changes as one moves from one language to another. I think that it is true, but true to a limited extent. It is sometimes difficult enough to make oneself understood in a single language, and the difficulty can be multiplied when one attempts to translate that language into another. However, we should not put too much weight on the difficulties, for it is pellucid that languages are not so protean that we cannot recognize ideas in translation. Yet, I will assume (along with Yniguez) that the content does change to a measurable extent when the State's rules, regulations, and messages are changed into a different language, even if language is not pure content.
 
 
 172
 If that is true, it is a powerful reason to uphold Article XXVIII. It is well settled that the State has the right to control the content of what it is paying for; it can control what is said by those who are acting on its behalf. As the Supreme Court put it in Rosenberger v. Rector and Visitors of Univ. of Va., --- U.S. ----, ---- - ----, 115 S.Ct. 2510, 2518-19, 132 L.Ed.2d 700 (1995):
 
 
 173
 [W]hen the State is the speaker, it may make content-based choices. When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message. In the same vein, in Rust v. Sullivan [500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ] we upheld the government's prohibition on abortion-related advice applicable to recipients of federal funds for family planning counseling. There, the government did not create a program to encourage private speech but instead used private speakers to transmit specific information pertaining to its own program. We recognized that when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes. 500 U.S. at 194 [111 S.Ct. at 1772]. When the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee.
 
 
 174
 Cf. Garcia v. Spun Steak Co., 998 F.2d 1480, 1487 (9th Cir.) (private employers may preclude speaking of a language other than English on the job--"an employee must often sacrifice individual self-expression during working hours"), reh'g en banc denied, 13 F.3d 296 (1993), cert. denied, --- U.S. ----, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1994); Jurado v. Eleven-Fifty Corp., 813 F.2d 1406, 1410-12 (9th Cir.1987) (private radio broadcaster may insist that its employees broadcast in English); Garcia, 13 F.3d at 302 ("No reasonable person would suggest that Title VII requires the operator of an English language radio station to permit a hired broadcaster to broadcast ... in another language....") (Reinhardt, J., dissenting from denial of rehearing en banc); Gutierrez v. Municipal Court, 838 F.2d 1031, 1041 (9th Cir.), reh'g en banc denied, 861 F.2d 1187 (1988), vacated as moot, 490 U.S. 1016, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989).
 
 
 175
 Thus, to the extent that language involves content, the State may choose to direct what that content must be. Moreover, it can hardly be doubted that the State can even choose to foster a particular language to some extent. As the Supreme Court said in Meyer v. Nebraska, 262 U.S. 390, 402, 43 S.Ct. 625, 628, 67 L.Ed. 1042 (1923) (emphasis added): "The power of the state to compel attendance at some school and to make reasonable regulations for all schools, including a requirement that they shall give instructions in English, is not questioned." Certainly, if the State can require teaching in a particular language, it can itself choose to use a particular language to express the content of what it has to say.
 
 
 176
 To the extent that a language involves a mode of expressing ideas which themselves could be expressed in different languages, Yniguez's argument fares no better. It is most difficult to see why the State cannot constitutionally require its employees to use one mode of expression--one language--just as it can require that its employees use a particular mode of performing the rest of their duties. Surely, for example, the State can direct that its ditches be dug and that its contracts be let in particular ways, even if an employee correctly thinks that another mode of performance would be more efficient. Any good employer will listen to its employees' suggestions about how a job may best be done, but employers are not required to follow those suggestions. Nor does the First Amendment change that. Cf. Smith v. Arkansas State Highway Employees, 441 U.S. 463, 465, 99 S.Ct. 1826, 1828, 60 L.Ed.2d 360 (1979) (per curiam).
 
 
 177
 When a mode of expression attracts First Amendment scrutiny, it is because it implicates ideas themselves. There is nothing sacrosanct about the mode. It, as a mode, could be regulated if the regulation only be rational. But where the mode becomes laden with content, the mode itself may be scrutinized so that any protected content will not be injured. As the Supreme Court said in R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), in reference to sound trucks and fighting words: "[e]ach ... is a 'mode of speech' ...; both can be used to convey an idea, but neither has, in and of itself, a claim upon the First Amendment." Id. at 386, 112 S.Ct. at 2545. See also Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293-95, 104 S.Ct. 3065, 3068-69, 82 L.Ed.2d 221 (1984) (assuming--not deciding--that overnight camping is expressive conduct, it can still be regulated); United States v. O'Brien, 391 U.S. 367, 375, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."). The point is underscored by Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). There, even though the mode of showing contempt was the highly expressive and content-laden act of burning the flag, only a bare majority of the Court was willing to find constitutional protection for the defendant's activities. Id. at 420, 109 S.Ct. at 2548.
 
 
 178
 Thus, Yniguez cannot seek First Amendment protection of the pure mode element of a language. The mode must itself seek shelter under the wing that protects the expressive or content element. However, as already indicated, the content element cannot help her here.
 
 
 179
 Of course, none of this means that the State can preclude the general public from learning or speaking a particular language. The State cannot do that. See Farrington v. Tokushige, 273 U.S. 284, 299, 47 S.Ct. 406, 409, 71 L.Ed. 646 (1927); Bartels v. Iowa, 262 U.S. 404, 411, 43 S.Ct. 628, 630, 67 L.Ed. 1047 (1923); Meyer, 262 U.S. at 400-03, 43 S.Ct. at 627-28; cf. Pierce v. Society of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925). It does mean that any protection must be sought in a place other than the First Amendment, or for something other than the mode itself.
 
 
 180
 The penultimate line needed to sketch the path out of Yniguez's thicket can be drawn by considering the fact that individual citizens have no constitutional right to require that state services be performed in any particular language. When plaintiffs asserted that they had a constitutional right to have the State supply Spanish-speaking employees and notices in Spanish, we turned that claim aside. See Carmona v. Sheffield, 475 F.2d 738, 739 (9th Cir.1973). And when a demand for bilingual education was made, we also turned that aside. Guadalupe Org., Inc. v. Tempe Elementary Sch., Dist. No. 3, 587 F.2d 1022, 1026-27 (9th Cir.1978). As we saw it, that was a question of a high political order and was one for the people themselves to decide. Id. at 1027. The people of Arizona decided the question here, for good or ill.
 
 
 181
 This case, then, presents a confluence of lines of argument. Employees of the State are subject to numerous restrictions upon their freedoms, their actions, and their speech, which the government could not impose upon the general public. The State can, in general, control the content and mode of its own speech, and the general public does not have a constitutional right to have the State provide services in any particular language. In the face of all of that, it is well nigh unintelligible to say that individual officers and employees of the State can perform state business in a language of their own choice, despite the State's direction that they shall use a particular language.
 
 
 182
 Of course, I recognize that a State's restrictions upon its employees must not be so irrational that they may be branded arbitrary. See Kelley, 425 U.S. at 248, 96 S.Ct. at 1446. Can this Article of the Arizona Constitution be so branded if we believe it to be ill-conceived? I think the answer lies in Guadalupe Organization, 587 F.2d at 1027 (citation omitted):
 
 
 183
 Linguistic and cultural diversity within the nation-state, whatever may be its advantages from time to time, can restrict the scope of the fundamental compact. Diversity limits unity. Effective action by the nation-state rises to its peak of strength only when it is in response to aspirations unreservedly shared by each constituent culture and language group. As affection which a culture or group bears toward a particular aspiration abates, and as the scope of sharing diminishes, the strength of the nation-state's government wanes.
 
 
 184
 Syncretism retards, and sometimes even reverses, the shrinkage of the compact caused by linguistic and cultural diversity. But it would be incautious to strengthen diversity in language and culture repeatedly trusting only in the syncretic processes to preserve the social compact. In the language of eighteenth century philosophy, the century in which our Constitution was written, the social compact depends on the force of benevolence which springs naturally from the hearts of all men but which attenuates as it crosses linguistic and cultural lines. Multiple linguistic and cultural centers impede both the egress of each center's own and the ingress of all others. Benevolence, moreover, spends much of its force within each center and, to reinforce affection toward insiders, hostility toward outsiders develops.
 
 
 185
 The fundamental nature of these tendencies makes clear that their scope varies from generation to generation and is fixed by the political process in its highest sense. The Constitution, aside from guaranteeing to individuals certain basic rights, privileges, powers, and immunities, does not speak to such matters; it merely evidences a compact whose scope and strength cannot be mandated by the courts but must be determined by the people acting upon the urgings of their hearts. The decision of the appellees to provide a predominantly monocultural and monolingual educational system was a rational response to a quintessentially "legitimate" state interest. The same perforce would be said were the appellees to adopt the appellants' demands and be challenged by an English-speaking child and his parents whose ancestors were Pilgrims.
 
 
 186
 Whatever may be the consequences, good or bad, of many tongues and cultures coexisting within a single nation-state, ... [their validity] cannot be determined by reference to the Constitution.
 
 
 187
 In fine, the people of the State of Arizona did not violate the First Amendment when they adopted Article XXVIII. For good or ill, it was a question "for the people to decide." Id.
 
 
 188
 Therefore, I respectfully dissent.
 
 WALLACE, Chief Judge, concurring:
 
 189
 I fully join Judge Fernandez's dissent. I add the following:
 
 
 190
 Yniguez's claim that the Article regulates speech, not merely the expressive mode of speech, is dubious. The difficulties of Yniguez's claim become apparent when one tries to identify exactly what speech or message the Article suppresses. If Yniguez is able to identify to us in English the messages that the Article suppresses, she would thereby communicate those messages which she claims only Spanish can convey. In other words, by stating in English the speech or message which the Article restricts, Yniguez undermines her claim that her message can only be expressed in Spanish. Saddled with this problem, the majority, therefore, never identifies the content of the speech which the Article suppresses and writes vaguely about the Article's restrictions.
 
 
 191
 It is untenable for the majority to hold that the Article restricts pure speech yet fail to identify suppressed messages. This difficulty strengthens the undeniable conclusion that the Article regulates the mode of speech, not pure speech. This conclusion should end the matter, for mere regulation of government employees' mode of speech does not implicate the First Amendment or require the various balancing tests which the majority employs.
 
 
 192
 The majority's failure to identify clearly the meaning conveyed by using one language rather than another confuses its evaluation of the interests favoring First Amendment protection. Building on recent Supreme Court decisions, the majority considers the public's right to "receive information and ideas" in order to determine whether Yniguez's speech is protected. Yet, the majority can point to no bit of information about medical malpractice claims which can only be communicated in a non-English language--and which Article XXVIII would thereby restrict Yniguez from communicating and the public from receiving. The majority is simply unable to show the public's interest in the unique content and meaning which Yniguez can only convey in the Spanish language. Instead, it points to the interests members of the public have in receiving Yniguez's message in a manner and language they can easily understand. In effect, the majority asserts that many Arizonans would prefer Yniguez speak in a mode which they can easily understand--no doubt a true observation, but the public's interest in a civil servant's particular mode of communication does not warrant First Amendment protection.
 
 
 193
 Also, the majority's view that when Yniguez speaks in a language other than English, she comments as a citizen on a matter of public concern ignores the cases which define "matter of public concern." These cases look to the content of public employees' speech to see whether it contributes to public debate. See United States v. National Treasury Employees Union, --- U.S. ----, ----, 115 S.Ct. 1003, 1015, 130 L.Ed.2d 964 (1995) (matter of public concern were speeches and articles for which government employees received payment); Rankin v. McPherson, 483 U.S. 378, 386, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987) (matter of public concern was employee's highly negative opinion of President's policies); Connick v. Myers, 461 U.S. 138, 148, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983) (questions about pressure on government lawyers to participate on political campaigns did not constitute speech on matter of public concern); Pickering v. Board of Educ. of Township High School Dist., 391 U.S. 563, 569, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968) (matter of public concern was letter to editor discussing school budget).
 
 
 194
 Contrary to precedent, the majority rules that if members of the public would like to receive public employees' speech in a certain way, that desire constitutes a matter of public concern. Such reasoning ignores the difference between a government employee who contributes to the marketplace of ideas and an employee who speaks in a mode which helps members of the public understanding what he says. The most recent Supreme Court case on point found that speech is of public concern when it "addresse[s] a public audience, [is] made outside the workplace, and involve[s] content largely unrelated to ... government employment." National Treasury Employees, --- U.S. at ----, 115 S.Ct. at 1013. The purportedly suppressed speech here does not fit this description.
 
 
 195
 KOZINSKI, Circuit Judge, with whom Judge KLEINFELD joins, dissenting:
 
 
 196
 A house divided against itself cannot stand.--Abraham Lincoln
 
 
 197
 Government has no mouth, it has no hands or feet; it speaks and acts through people. Government employees must do what the state can't do for itself because it lacks corporeal existence; in a real sense, they are the state. This case is about whether state employees may arrest the gears of government by refusing to say or do what the state chooses to have said or done.
 
 
 198
 The majority says yes. Or, to be precise, it says the employees may force their employer into federal court and make it prove, to the exacting standard of the First Amendment, that its interest in enforcing its laws outweighs their right not to make statements they find objectionable. This is an extraordinary ruling with explosive and far-reaching consequences. Almost everything government does involves a communication of some sort and those charged with carrying out government functions sometimes disagree with what they are ordered to say or do. Before today, however, it was understood that government employees have no personal stake in what they say in the course of employment because that speech is the government's, not theirs.
 
 
 199
 Today's decision rends this fundamental understanding of how government works by giving bureaucrats the right to turn every policy disagreement into a federal lawsuit. Maria-Kelly Yniguez was hired by the State of Arizona to perform various functions connected with processing medical malpractice claims. The people of Arizona--Yniguez's ultimate superiors--then augmented her duties: They charged her with promoting English by using only that language for official business. The people of Arizona were warned that this might disrupt services and make government employees less efficient. See Arizona Publicity Pamphlet 32-33 (General Election, Nov. 8, 1988) (arguments against Proposition 106 by Rose Mofford, Governor; Morris K. Udall, U.S. Representative; Jesus "Chuy" Higuera, Arizona State Senator). Arizonans nevertheless chose to make this tradeoff. Since they were paying Yniguez's salary, I had assumed it was their call whether Yniguez spent her work-time processing claims, promoting English or twiddling her thumbs.
 
 
 200
 Not so, says the majority. Because the law in question requires Yniguez to speak, she acquires First Amendment rights in the content and manner of that speech. Majority Op. at 939-42. What Yniguez says, and in what tongue, is thus no longer a business judgment by her employer; it's a constitutional question. If Yniguez disagrees, she can haul her employer into federal court and force it to prove that the law's advantages outweigh her right to say what she pleases. Nor is this pro forma, rationality review. As the interminable majority opinion demonstrates, this is high-octane review involving all sorts of substantive judgments about the wisdom and efficacy of the law in question. Majority Op. at 942-47.
 
 
 201
 Such scrutiny is highly intrusive, as well as costly and time-consuming. We must ask ourselves, therefore, whether similar challenges could be raised by other government employees with qualms about the laws they're hired to enforce. The alarming truth is that there's nothing unique about Yniguez's situation, nothing unusual about her claim. The same sort of challenge could be raised by just about every disgruntled government employee.
 
 
 202
 Consider the following example: A Deputy Attorney General develops doubts about whether the death penalty is constitutional; he files a brief urging the state supreme court to vacate a death sentence. Can the Attorney General discipline him? Not anymore. Like Yniguez, the Deputy can claim the brief is his speech (after all, it carries his name) and he has First Amendment rights not to say things that chafe his conscience and offend the Constitution. He can argue, as does Yniguez, that the law in question serves no legitimate purpose; he can show, like Yniguez, that abandoning the law would make him more efficient.
 
 
 203
 How can the state meet such a challenge? How can it hope to establish, to the demanding standard erected by the majority, that its interest in pursuing the death penalty outweighs the Deputy's First Amendment right to espouse a contrary view? Whether the death penalty deters violent crime or serves other legitimate ends are questions about which reasonable minds differ; there are many--including some of my colleagues, see, e.g., Stephen Reinhardt, "The Supreme Court, The Death Penalty, and the Harris Case," 102 Yale L.J. 205, 216 (1992) ("[T]he courts may be functionally incapable of handling death penalty cases fairly and judiciously.")--who believe the death penalty is a cruel anachronism. The state couldn't demur that the Deputy's superiors had made the policy judgment and merely assigned him the task of implementing it. Yniguez's superiors had decided to promote the use of English and merely assigned her the job of implementing that policy. Like Yniguez, the prosecutor would be entitled to argue that the federal court should change his job description.
 
 
 204
 So too would zillions of other government employees, like the following:
 
 
 205
 * City adopts bilingual policy to give non-Anglophone residents better access to government services, but employee claims a First Amendment right to speak only English. In his view, use of other languages denies minority groups a fair opportunity to assimilate.
 
 
 206
 * Social worker disagrees with county's policy of encouraging single mothers to enter the workforce and tells mother to stay home with her baby.
 
 
 207
 * Public school teacher disagrees with school district's policy of teaching evolution and tells students that man sprang into being from the tears of the Egyptian god Ra-Atum.
 
 
 208
 * Deputy sheriff thinks Miranda warning is silly and tells suspects, "Lawyers are slimeballs. 'Fess up, and the judge'll go easy on you.' "
 
 
 209
 * Recruiter for public university disagrees with state's affirmative action policy and tells minority applicants not to "expect any favors."
 
 
 210
 Most cases may, after much litigation, be resolved in favor of the government. But there would be no way to keep them out of court. And in no case would the state be entitled to say, "We chose policy X because we had a hunch it might work, but we haven't any proof." No, indeed. When confronted with what will come to be known as a Yniguez challenge, states, cities, counties, even the federal government, will have to prove that their laws are worth the candle; courts will routinely make judgments traditionally reserved for the legislature and the people themselves. By comparison, Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), will seem like a paean to judicial restraint.
 
 
 211
 This problem cannot be solved by tinkering with the fine points of the rule announced today. The fault lies in the rule's central premise--the dangerous notion that government employees have a personal stake in the words they utter when they speak for the government. The force of this idea will turn government employment into a platform for endless attacks on government policy and governance into a tug of war between those who make the laws and those who enforce them.
 
 
 212
 The majority masks the enormity of its departure by pretending this is just another employee-speech case like Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), or Waters v. Churchill, --- U.S. ----, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). But the question in those cases was whether employees could be disciplined for what they said as private citizens. In such circumstances, the Court explained, "[t]he problem ... is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35 (emphasis added). Yniguez's case has nothing in common with Pickering because the speech here belongs to the government; there's nothing to balance.
 
 
 213
 Under Pickering and Waters, Yniguez can try to change the law through the political process; she can speak out against Article XXVIII on her own time, and in any language she pleases; she can campaign for its repeal. This is much different from the right the majority creates for her--the right to block government policy because she happens to disagree with it.
 
 
 214
 Twice in recent years has the Supreme Court relied on the pivotal distinction the majority ignores. In Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), federally-funded medical clinics were prohibited from counseling about abortion; the clinics argued that this prohibition violated the free speech rights of their employees. The Supreme Court shrugged: Those who work in clinics that take federal money must conform their on-the-job speech to federal law. This doesn't offend the First Amendment because "[t]he employees remain free ... to pursue abortion-related activities when they are ... acting as private individuals." Id. at 198-99, 111 S.Ct. at 1775.
 
 
 215
 The Court again addressed the issue in Rosenberger v. University of Virginia, --- U.S. ----, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). The question in Rosenberger was whether the state could deny funding to a student publication based on its content. The Court said no, because the speech at issue wasn't the government's. In reaching this conclusion, it distinguished Rust and Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), as standing for the proposition that "when the State is the speaker, it may make content-based choices." --- U.S. at ----, 115 S.Ct. at 2518. The Court went on to explain that it has "permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." Id. (emphasis added).
 
 
 216
 Confronted with recent Supreme Court cases that cut the heart from its analysis, the majority responds with ... a footnote. Majority Op. at 940 n. 24. And what a footnote! As best one can tell, the majority reads Rust and Rosenberger as applying only where the government uses a private party to disseminate its message, not where it speaks through its own employees. This would be a pretty good argument, were it not for two things: the Supreme Court's language and common sense. As for language, one need look no farther than the passage from Rosenberger underscored above. The Court there holds that government may control the content of speech both where "it is the speaker" and where "it enlists private entities to convey its own message." Rosenberger, --- U.S. at ----, 115 S.Ct. at 2512. Since government "is the speaker" only through its employees, Rust and Rosenberger clearly encompass Yniguez's situation. In dismissing these cases as dealing with "entirely different circumstances," the majority overlooks what the Court in fact said.
 
 
 217
 But put language aside and consider the logic of the situation: What earthly reason would there be to give employees of government-subsidized entities fewer First Amendment rights than public employees? Does the majority think the government could refuse to fund an otherwise qualified private group because its employees speak out against the government? Or belong to the wrong political party? Or practice an unpopular religion? Surely not. Pickering, Waters and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), protect employees of private entities vying for government funding no less than public employees. The reason Rust and Rosenberger saw no First Amendment problem when government controls the speech of those who carry its message is that this is perfectly consistent with Pickering. Rust and Rosenberger stand squarely for the proposition that the government may write the script when it is the speaker.
 
 
 218
 This is not to say that Arizona's English-only policy is constitutional. As the majority and the concurrence point out, Article XXVIII makes it harder for many Arizonans to receive government services. A successful challenge might be raised by those whose ability to deal with their government is thereby impaired. Nor is the First Amendment the only basis on which the policy might be attacked; Yniguez also charges that the English-only policy violates equal protection and conflicts with Title VI of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000d. No court has yet considered these arguments, which go more directly to the heart of this dispute. But to give Yniguez the right to decide what she will say when she is the state's agent opens the courthouse door to countless other employees who disagree with some expressive aspect of their jobs. While I understand my colleagues' eagerness to do away with a law they see as misguided and divisive, the price they pay is too high. No rational society can afford it.
 
 
 
 [1]
 All further references to Arizonans for Official English also include by implication Parks
 
 
 [2]
 We also hold that Yniguez is entitled to nominal damages. Given our affirmance on the merits, we need not rule upon the state defendants' claim that, in the event of a reversal, the plaintiff's attorney's fees award should be vacated
 
 
 [3]
 Judge Thomas Tang of Arizona was a member of the three-judge panel and the en banc court. He died on July 18, 1995, two days before the en banc oral argument. He was replaced on the en banc court by Judge Kozinski. Because the decision of the en banc court is essentially identical to the panel opinion, it is important to note that Judge Tang contributed greatly to that earlier opinion. Many of the ideas and much of the language was his. Although he was unable to participate in the deliberations of the en banc court, this decision reflects his views and his wise understanding of the Constitution
 
 
 [4]
 It should be noted that the bulk of the underlying facts in this case were stipulated to by Yniguez and the state defendants. Arizonans for Official English, however, makes certain factual allegations in its briefs on appeal that are unsupported or even contradicted by the record. Compare Opening Brief at 24 (Yniguez' use of Spanish "would interfere with the government's substantial interest in the efficiency of its workforce") with Stipulated Facts at 5 (Yniguez' use of Spanish "contributes to the efficient operation of the State"). Nonetheless, the organization made no effort to supplement the record on appeal or to seek a remand. Rather, it explicitly states in its brief that there are no material facts in dispute. At any rate, the facts stipulated to by Yniguez and the state defendants are in the main self-evident. Accordingly, our legal conclusions are based on the record as stipulated to by the original parties
 
 
 [5]
 Yniguez' original complaint, filed November 10, 1988, named only the State of Arizona as a defendant. She later filed an amended complaint including the other defendants
 
 
 [6]
 In particular, the court relied on the fact that "Mofford has officially stated that she intends to comply with Article XXVIII and expects state service employees, of which Yniguez is one, to comply with Article XXVIII." Yniguez, 730 F.Supp. at 312
 
 
 [7]
 Because the district court found that Article XXVIII violated the First Amendment, it did not reach the other constitutional and statutory grounds that Yniguez asserted for invalidating the provision
 
 
 [8]
 Asking this court to revisit issues already decided in Yniguez II, the cross-appellee state defendants assert that Yniguez's request for nominal damages is untimely because such damages were not specifically requested at trial, and their denial was not specifically appealed at that time. However, as we held in Yniguez II, Yniguez's blanket request for "all other relief that the Court deems just and proper under the circumstances," encompasses a request for nominal damages. 975 F.2d at 647. In addition, as to her appeal of the district court's denial of such damages, Yniguez has precisely followed the steps we described in that opinion. See id. at 647 & n. 2 (stating that Yniguez "may raise the issue of nominal damages in a future cross-appeal")
 Similarly, Yniguez suggests that the appeal of Arizonans for Official English is untimely because its notice of appeal was not filed within thirty days of the date that our order permitting intervention was entered on the district court's docket. However, we retained jurisdiction over the case during that period in reviewing the suggestion of mootness filed by the state. We did not relinquish jurisdiction until after September 16, 1992, when we filed our opinion rejecting the mootness suggestion. In that opinion, we specifically explained that "[t]he district court may now proceed to allow the parties to perfect their appeals and to conduct further proceedings in conformity with our dispositions." Yniguez II, 975 F.2d at 648. Although for some reason no mandate issued thereafter, the district court received the case back on November 5, 1992, and Arizonans for Official English timely filed its notice of appeal within thirty days of that date.
 
 
 [9]
 All further references to Arizonans Against Constitutional Tampering include by implication Espinosa
 
 
 [10]
 The federal government of the United States has never recognized English as the "official language," either under the Constitution or federal law. See generally Perea, Demography and Distrust: An Essay on American Languages, Cultural Pluralism and Official English, 77 Minn.L.Rev. 269, 271-81 (1992) (noting that Continental Congress issued official publications in German and French, as well as English, and that the Framers purposely gave no special designation to English). As one academic commentator has explained, "early political leaders recognized the close connection between language and religious/cultural freedoms, and they preferred to refrain from proposing legislation which might be construed as a restriction on these freedoms." Heath, Language and Politics in the United States, in Linguistics and Anthropology 267, 270 (1977). Recent efforts to establish English as the official national language have not succeeded. See H.R.J.Res. 81, 101st Cong., 1st Sess. (1989); S.J.Res. 13, 100th Cong., 1st Sess. (1987); see also Comment, The Proposed English Language Amendment: Shield or Sword?, 3 Yale L. & Pol'y Rev. 519 (1985); Harris v. Rivera Cruz, 710 F.Supp. 29, 31 (D.P.R.1989) (stating that "[i]n the United States, there is no official language, and if prudence and wisdom (and possibly the Constitution) prevail, there never shall be"). But cf. Soberal-Perez v. Heckler, 717 F.2d 36, 42 (2d Cir.1983) (asserting that "English is the national language of the United States"), cert. denied, 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984); DaLomba v. Director, 369 Mass. 92, 337 N.E.2d 687, 689 (1975) (stating that "English is the official language of this country")
 
 
 [11]
 Besides Arizona, the states that have adopted such provisions are: Alabama, Ala. Const. amend. 509; Arkansas, Ark.Code Ann. Sec. 1-4-117; California, Cal. Const. art. III Sec. 6; Colorado, Colo. Const. Art. II Sec. 30a; Florida, Florida Const. art. II Sec. 9; Georgia, Ga. L. 1986, p. 529; Hawaii, Haw. Const. art. XV Sec. 4; Illinois, Ill.Code 5 Sec. 460/20; Indiana, Ind.Code Ann. Sec. 1-2-10-1; Kentucky, Ky.Rev.Stat.Ann. Sec. 2.013; Mississippi, Miss.Code Ann. Sec. 3-3-31; Nebraska, Neb. Const. art. 1 Sec. 27; North Carolina, N.C.Gen.Stat. Sec. 145-12; North Dakota, N.D.Cent.Code Sec. 54-02-13; South Carolina, S.C.Code Ann. Sec. 1-1-696; Tennessee, Tenn.Code Ann. Sec. 4-1-404; and Virginia, Va.Code Ann. Sec. 22.1-212.1. Compare Meyer, 262 U.S. at 395, 43 S.Ct. 625 (stating that "twenty-one States besides Nebraska have enacted similar foreign language laws") (argument of defendant)
 Two of these states--California and Hawaii--are in our circuit. The "official-English" provisions in these states, like those of other states besides Arizona, appear to be primarily symbolic. See, e.g., Puerto Rican Org. for Political Action v. Kusper, 490 F.2d 575, 577 (7th Cir.1973) (noting that official-English law appears with laws naming state bird and state song, and does not restrict use of non-English languages by state and city agencies). Article III, section 6 of the California Constitution merely establishes English as the official language of the state of California; it imposes no prohibition on other languages and does not affect their use in the functioning of state government. Hawaii's provision is unlike California's in that it recognizes both English and Hawaiian as official state languages, but it too appears to have little practical effect. Given the extent to which the California and Hawaii provisions differ from Article XXVIII, our opinion in this case should not be construed as expressing any view regarding their constitutionality.
 
 
 [12]
 At the oral argument before the panel, Arizonans for Official English partially endorsed the Attorney General's reading of Article XXVIII. While purporting to agree with the Attorney General that the provision's mandate that the state and its subdivisions "shall act in English" covered only official governmental acts, the organization nonetheless suggested vaguely that its interpretation of the provision was broader than that of the Attorney General, and that it might, for example, construe the provision as prohibiting state employees from speaking another language in the performance of their duties when unnecessary to do so
 The organization's briefs to the panel were even less clear in indicating its position regarding Article XXVIII's proper scope. The briefs were, first of all, quite reticent on the question. However, the arguments asserted in support of the provision were quite sweeping, and seemed most appropriate to an extremely broad prohibition on the use of non-English languages by government officials and employees. Although we would, even absent these briefs, be entirely unconvinced by the proffered limiting construction (see below), we find "[t]hat construction even less plausible in light of the broad purposes that [the appellants] insist[ ] underlie the [provision]." Lind v. Grimmer, 30 F.3d 1115, 1123 n. 8 (9th Cir.1994) (citing Erznoznik v. City of Jacksonville, 422 U.S. 205, 217, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975)).
 Before the en banc court, Arizonans for Official English's and the Attorney General's explanations as to the initiative's scope were confused and self-contradictory. At best, they shed little light on how the amendment could rationally be construed in a limiting manner and at worst they helped make it clear that it could not be.
 
 
 [13]
 Similarly, Article XXVIII also describes English as the language of "all government functions and actions." Sec. 1(2). Under no sense of either "functions" or "actions", are the two words limited to official acts. Cf. Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (finding state action in prosecutor's peremptory challenges of prospective jury members). We note also that the initiative's ballot materials and publicity pamphlets do not support the Attorney General's post-hoc construction of Article XXVIII. Instead, they described the "meaning and purpose" of the initiative to the voters in far broader terms. See Bussanich v. Douglas, 152 Ariz. 447, 450, 733 P.2d 644, 647 (App.1986) (examining ballot materials and publicity pamphlets in construing an initiative)
 
 
 [14]
 The Attorney General has only stated that a narrow construction "may ... be necessary to avoid conflict" with the federal constitution, and his analysis on the point was based on the Equal Protection Clause of the Fourteenth Amendment rather than the First Amendment
 
 
 [15]
 The district court held that the Eleventh Amendment barred State Senator Gutierrez from suing state officials in federal court to challenge Article XXVIII's application to legislators. The district court concluded that these state officials lacked the power to enforce Article XXVIII against him and thus could not be proper federal defendants under Ex Parte Young. See Yniguez, 730 F.Supp. at 311. This ruling is not before us on appeal and we intimate no opinion as to its merits. However, it is important to note that the court's ruling does not mean that Article XXVIII's broad reach imposes no chilling effect upon the speech of legislators. Even if it were true that state officials have no authority to punish a legislator who violates Article XXVIII, it remains the case that legislators are required to comply with the state constitution and that harmful consequences may flow from violation of its provisions, including the possibility of civil liability as a result of the initiative's enforcement provision. Thus, whatever Gutierrez's particular power to bring this suit in federal court, the First Amendment interests of state legislators are properly considered as part of an inquiry into Article XXVIII's overbreadth
 
 
 [16]
 The Court's recent decision in United States v. National Treasury Employees Union, --- U.S. ----, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), is entirely consistent with our conclusion that if we find Article XXVIII to be unconstitutional, we must invalidate it on its face. In National Treasury Employees Union, the Court considered a challenge to a part of a statute that restricted the ability of persons in all three branches of the federal government to receive honoraria for making speeches or publishing articles. Although the Court upheld the constitutional challenge filed on behalf of "rank-and-file" civil servants in the executive branch, it offered three reasons for not also invalidating the provision as to senior officials in that branch, a group that was not before the Court. First, the Court explained that the senior officials received a 25 percent salary increase that was intended in part to offset the financial loss that the honoraria ban might cause. Id. at ---- - ----, 115 S.Ct. at 1018-19. Second, it concluded that different justifications might support applying the ban to senior officials than to rank-and-file members. Id. at ----, 115 S.Ct. at 1019. Finally, it concluded that relief could not be afforded in the manner ordered by the Court of Appeals without "tampering with the text of the statute[.]" Id
 None of these factors is present here. First, all public officers and employees are treated identically under Article XXVIII. None received any compensating benefits. Second, if the article is unconstitutional as to civil servants, it is necessarily unconstitutional as to officers and elected officials. See Yniguez, 730 F.Supp. at 314; cf. Bond, 385 U.S. at 132-33, 87 S.Ct. at 347-48. Finally, unlike in National Treasury Employees Union, here the relief we afford is simple and requires no tampering with the text of the measure.
 
 
 [17]
 We have no doubt, however, that even under the relatively relaxed test for expressive conduct set out in U.S. v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), Article XXVIII would be unconstitutional. Under O'Brien, "a government regulation is sufficiently justified if it is within the constitutional power of the government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." Id. at 377, 88 S.Ct. at 1679. Article XXVIII fails at least the final prong. See discussion, infra at Secs. IIID(4) and IIID(6)
 
 
 [18]
 The paradoxical attempt to classify choice of language as conduct is useful, perhaps, in underscoring the weakness of the strict conduct/speech distinction. As the example of American sign-language illustrates, we describe various kinds of physical conduct--whether the making of specific sounds or specific hand movements--as language when they have reached a level of sophistication in grammatical structure and vocabulary to allow them to convey complex ideas with a sufficient degree of accuracy. See Johnson, 491 U.S. at 404, 109 S.Ct. at 2539 (in deciding whether particular conduct is protected by the First Amendment, asking "whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it' ") (quoting Spence v. Washington, 418 U.S. 405, 410-11, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974))
 
 
 [19]
 It is important to recall, by contrast, that a monolingual person does not have the luxury of making the expressive choice to communicate in one language or another. If that person is to speak at all, it is in a single language which may not be English
 
 
 [20]
 Conversely, the deliberate choice to speak to someone in a language that he or she does not understand may convey a strong message of exclusion
 
 
 [21]
 We would only add that to ignore the substance of speech and to look solely to form when analyzing the impact of a prohibition on speech is to be wholly mechanical and artificial. That approach to constitutional analysis ill serves the purpose of the Bill of Rights and denigrates the judicial function. When the effect of banning a form of speech is to prevent receipt of the message by the intended audience, it cannot seriously be argued that the ban is innocuous because it applies only to the mode of speech
 Moreover, notwithstanding Chief Judge Wallace's assertion, see Wallace, concurring in dissent at 959, the Court has found modes of speech to be protected by the First Amendment. For example, the Court has repeatedly protected a speaker's right to deliver his message anonymously. McIntyre v. Ohio Elections Com'n, --- U.S. ----, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995); Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960). In those cases, the Court did not hold that the speaker could not deliver an identical message without anonymity, rather that the speaker might not do so. Here, prohibiting delivery of all messages in languages other than English ensures that many Arizonans will not receive certain messages at all.
 
 
 [22]
 The distinction between affirmative and negative rights, though its legitimacy has been much disputed in academic circles, continues to find favor with the Supreme Court. See, e.g., DeShaney v. Winnebago County Dep't of Social Servs, 489 U.S. 189, 196-97, 109 S.Ct. 998, 1003-04, 103 L.Ed.2d 249 (1989) (rejecting the view that the Constitution imposes "affirmative obligations" on the state). In some instances, the line separating the affirmative from the negative is hard to draw--even though it may be critical to the outcome of a case. Compare Union Free School Dist. No. 26, 457 U.S. at 855-56, 102 S.Ct. at 2802 (asking "whether the First Amendment imposes limitations [upon the school board's power] to remove library books from high school and junior high school libraries") (plurality opinion) (emphasis added), and id. at 878, 102 S.Ct. at 2813 (stating that the right at issue does not involve "any affirmative obligation to provide students with information or ideas") (Blackmun, J., concurring) (emphasis added), with id. at 886, 102 S.Ct. at 2817 (complaining that "the plurality suggests that there is a new First Amendment 'entitlement ' to have access to particular books in a school library") (Burger, C.J., dissenting) (emphasis added). In the present case, however, there can be no doubt that Article XXVIII represents a prohibition on non-English speech, not simply a failure to provide it
 
 
 [23]
 The dissent's statement that the speech in this case cannot be easily pigeonholed into one of the traditional legal categories is fully consistent with our analysis. However, unlike the dissent, we conclude, for the reasons discussed infra at 940-42, that the speech prohibited by Article XXVIII of the Arizona Constitution more closely resembles public concern than private concern speech
 Chief Judge Wallace's attempt to distinguish the speech of public employees who communicate information relating to governmental functions in languages other than English from off-the-job-speech in which public employees communicate their personal opinions relating to governmental matters only serves to prove our point conclusively. If the latter, as Judge Wallace correctly says constitutes speech of public concern, see Wallace, concurring in dissent at 960, so, a fortiori, must the former.
 
 
 [24]
 The Court's statements concerning the state's authority to make content-based distinctions when it is the speaker are not to the contrary. See Rosenberger v. Rector and Visitors of Univ. of Va., --- U.S. ----, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). In both cases, the Court granted the government broad, but not unlimited, power to regulate government-subsidized speech of private parties. Rosenberger involved government subsidization of speech by private parties pursuing their own goals, Rust government subsidization of speech by private parties carrying out a government program
 Neither Rosenberger nor Rust concerned the authority of the state to penalize the speech of its public employees, let alone to adopt a general prohibitory rule of sweeping applicability regarding such speech. We do not believe that isolated statements in these cases were meant to rewrite the Court's public employee speech doctrine. Nor do we believe that words used in cases dealing with wholly different issues should be wrenched from their context and applied mechanically to entirely different circumstances. While Rosenberger is of very recent origin, Rust has been with us for over four years. Rust has been cited more than 50 times by circuit courts, yet not once has it been applied in the context of a restriction on the speech of public employees. Rust is simply irrelevant here. In any event, we note that both cases demonstrate there are limitations on the restrictions that the state may impose.
 It is rare that governmental power is absolute, and constitutional limitations are wholly inapplicable. While government may certainly regulate or control speech when it is the speaker, it does not have unlimited power to regulate such speech; here, as elsewhere, it must act within constitutional constraints. The government could not, for example, force all public employees to wear pro-life lapel pins or deliver a pro-life message whenever in the performance of their work they communicate with members of the public, any more than it could require delivery of a pro-choice message under similar circumstances. To say that in most circumstances the government may regulate content by compelling or prohibiting on-the-job delivery of a particular message is a truism. However, pronouncing that truism does not resolve the question before us. It merely helps us reach the central issue of this case: Is the particular regulation--here, one that drastically affects not only public employees but also countless Arizonans who need desperately to communicate with their government--constitutional?
 
 
 [25]
 We note that in Gutierrez v. Municipal Court, 838 F.2d 1031 (9th Cir.1988), vacated as moot, 490 U.S. 1016, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989), while striking down an English-only rule applicable to the private speech of Los Angeles Municipal Courts employees on the ground that it violated Title VII, we explained that serious constitutional questions would arise if such a rule were to forbid communication in Spanish with the non-English-speaking public. Id. at 1044 n. 19
 
 
 [26]
 In Virginia Citizens, the Court struck down a statute declaring it unprofessional conduct for a licensed pharmacist to advertise the prices of prescription drugs, holding that the statute violated the First Amendment. Specifically, it found that the government's suppression of the flow of prescription drug price information violated consumers' right to receive the information. Id. at 770, 96 S.Ct. at 1829
 
 
 [27]
 The alternative is, of course, to apply the strict scrutiny test. See Rutan, 497 U.S. at 70 & n. 4, 110 S.Ct. at 2735 & n. 4. See also discussion infra at 941-42
 
 
 [28]
 The dissenters concluded that it is wholly irrelevant whether the restrictions at issue are justified on the basis of the "employer" interests of efficiency and effectiveness, or broader interests. See id. at 100, 110 S.Ct. at 2751 n. 3. In their view, there is "no reason in policy or principle" why the government should not be free to further even its broader interests through appropriate restrictions on employee speech. Id
 
 
 [29]
 The fact that the Supreme Court, deciding these cases in the 1920s, struck down the language restrictions in Meyer and Tokushige as violative of due process does not lessen their relevance. Substantive due process was the doctrine of choice for the protection of fundamental rights during the first part of this century, although it has now largely been replaced by other constitutional doctrines. See, e.g., Halter v. Nebraska, 205 U.S. 34, 42, 27 S.Ct. 419, 422, 51 L.Ed. 696 (1907) (similarly framing free speech claim in terms of property rights). It should therefore be clear that the Court's formal labeling of the right as falling under the rubric of substantive due process does not control our consideration of it--and, in fact, the Court subsequently explicitly recharacterized Meyer as protecting First Amendment freedoms. See Griswold v. Connecticut, 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965); see also Epperson, 393 U.S. at 105-06, 89 S.Ct. at 270-71 (First Amendment case considering Meyer as relevant but noting that it "was decided before the Court expressly applied the specific prohibitions of the First Amendment to the States"); Yassky, Eras of the First Amendment, 91 Col.L.Rev. 1699, 1733 (1991) (describing Meyer as First Amendment case); Tribe, American Constitutional Law 1319-20 (2d ed. 1988) (noting that Justice McReynolds wrote Meyer "[u]sing the tools of his time," but that it has been reinterpreted as embodying First Amendment principles)
 
 
 [30]
 The dissent in Bartels v. Iowa, 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047 (1923), which applied equally to Meyer, strongly emphasized this point. 262 U.S. at 412, 43 S.Ct. at 630. The majority, however, remained unpersuaded that these concerns outweighed the fundamental rights at issue
 
 
 [31]
 The dissent treats Guadalupe Organization, a case that does not even discuss the First Amendment and which focused on the right to be instructed in a foreign language about a foreign culture, as the touchstone for deciding this First Amendment challenge. We agree with Guadalupe Organization to the extent that it sets forth the advantages that accrue from encouraging those living in this nation to learn English and to share in our use of a common language. At the same time we recognize that cultural diversity and tolerance of differences are among our nation's greatest strengths, as is our unwillingness to impose uniformity or orthodoxy by fiat. This court's position regarding linguistic and cultural diversity and the constitutionally-permissible means for promotion of our growth as a unified nation are the ones expressed in this majority opinion and the concurrence of Judge Brunetti whose separate statements on this point we fully endorse. We disapprove, however, the part of Guadalupe Organization on which the dissent relies and which it quotes at pages 958-59. By doing so, we do not intend to unsettle the holding of our earlier decision; the question resolved in Guadalupe Organization is not before us, and we do not consider the part of the opinion we disapprove essential to the conclusion the Guadalupe Organization court reached
 
 
 [32]
 Cf. Hernandez v. New York, 500 U.S. 352, 369, 111 S.Ct. 1859, 1872, 114 L.Ed.2d 395 (1991) (noting that in some contexts proficiency in particular languages might be "treated as a surrogate for race"); but cf. Carmona v. Sheffield, 475 F.2d 738, 739 (9th Cir.1973); Soberal-Perez v. Heckler, 717 F.2d 36, 41 (2d Cir.1983), cert. denied, 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984)
 
 
 [33]
 We note, once again, a strong similarity between this case and Meyer. Because they invalidated Nebraska statute to a large extent targeted the substantial German-American community in that state (and was enacted in the wake of World War I), Meyer has been viewed as a precursor to modern equal protection doctrine. Tribe, supra, at 1320 n. 13; Hernandez, 500 U.S. at 371, 111 S.Ct. at 1873. This reading of Meyer is strengthened by the fact that one of the laws struck down in Bartels v. State of Iowa, 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047 (1923), its companion case, specifically singled out the German language for repression. See Bartels, 262 U.S. at 410 n. 2, 43 S.Ct. at 629 n. 2 (statute allowed teaching of non-English languages as elementary school subjects, "provided that the German language shall not be taught"). Even Justice Holmes, who otherwise dissented from the majority opinion, agreed that that statute was unconstitutional. Bartels, 262 U.S. at 413, 43 S.Ct. at 630 (Holmes, J., dissenting)
 The speech of unpopular groups, of course, often meets with hostility and repression, though it is more commonly the message that is targeted than the language in which it is communicated. Given the link between unpopular speech and unpopular groups, it is not surprising that even some of our most venerable First Amendment precedents have an (albeit implicit) equal protection component. See, e.g., Barnette, supra (Jehovah's Witnesses); New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (black civil rights activists).
 
 
 [34]
 Indeed, an award of nominal damages in recognition of society's interest in vindicating the disputed right is singularly appropriate in First Amendment overbreadth cases such as this, for a successful plaintiff in an overbreadth case has convinced the court to strike down a law that would, if left standing, chill the constitutionally protected speech of large numbers of other members of society
 
 
 [1]
 I do not mean to suggest that my worthy colleague would discriminate against public employees. They would fare no worse in his regime than private employees. Judge Kozinski would strip the latter of the fruits of the basic job protection provisions that they fought for so long and so bitterly. See Judge Kozinski's dissent in Sanders v. Parker Drilling Co., 911 F.2d 191, 204 (9th Cir.1990), in which Judge Kozinski advocated upholding permanent discharges of employees on the basis of mere suspicion, notwithstanding a just-cause-for-discharge clause
 
 
 [1]
 She has been joined by Arizonans Against Constitutional Tampering (AACT), but this opinion will generally hereafter refer only to her for notational convenience
 
 
 [2]
 I see no substantial difference between employees and state officials when the officials are performing the business of the state
 
 
 [3]
 I use the word "language" to refer to those bodies of words and their pronunciation and methods of combining them which are used and understood by a considerable community and established by long usage. See Webster's Third New International Dictionary 1270 (1986). Most prominently mentioned in this case are English and Spanish
 
 
 [4]
 I undertake this explication with some disquiet because a jurisdictional question broods over this case. Yniguez herself no longer works for the State. That certainly moots her claim for injunctive relief. The Attorney General says that the State has expressly waived its Eleventh Amendment defense to nominal damages, but Yniguez did not ask for those damages in the district court. It seems unusual to allow her to now appeal the failure of the district court to grant those damages. See Fitzgerald v. Century Park, Inc., 642 F.2d 356, 359 (9th Cir.1981) (declining to consider plaintiff's request for nominal damages raised for the first time on appeal). As to AACT, we have no evidence before us to indicate that it meets the requirements of the traditional standing doctrine. See Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). However, we have declared a special rule that public interest group sponsors and supporters of initiative measures have standing as of right. See United States v. City of Oakland, 958 F.2d 300, 301 (9th Cir.1992); Sagebrush Rebellion, Inc. v. Watt, 713 F.2d 525, 527-28 (9th Cir.1983), aff'd, 790 F.2d 760 (9th Cir.1986); Washington State Bldg. & Constr. Trades Council v. Spellman, 684 F.2d 627, 630 (9th Cir.1982), cert. denied, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). The same rule must apply to public interest group opponents of initiative measures. Thus, I press on